**PITTSBURG & MIDWAY COAL MINING COMPANY,**
Plaintiff–Appellant,

v.

**Kee Ike YAZZIE, Roselyn D. John, Romero Brown, Lewis Calamity, Peter J. Korth, and David C. Brunt,** Defendants–Appellees.

Nos. 88–2413, 88–8071.

United States Court of Appeals, Tenth Circuit.

May 30, 1990.

As Amended Aug. 3, 1990.

Christopher Lane, Sherman & Howard, Denver, Colo. (Mary J. Kelly and G. Sonny Cave, Sherman & Howard, Denver, Colo., James G. di Zerega and Kent R. Olson, Englewood, Colo., with him on the briefs), for plaintiff-appellant.

Paul E. Frye, Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, New Mexico (Michael P. Upshaw, Atty. Gen., and Paull Mines, Navajo Nation Dept. of Justice, Window Rock, Arizona, with him on the brief), for defendants-appellees.

Lynn H. Slade, Walter E. Stern, William C. Scott and George R. McFall, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, on the brief, for amici curiae, Santa Fe Pacific R.R. Co. and Cerrillos Land Co.

Hal Stratton, Atty. Gen., and Christopher D. Coppin, Asst. Atty. Gen., Santa Fe, N.M., on the brief, for amicus curiae, the State of N.M.

Melody L. McCoy and Robert T. Anderson, Native American Rights Fund, Boulder, Colo., on the brief for amici curiae, Cheyenne–Arapaho Tribes and Native Village of Venetie.

Before MOORE, ANDERSON and BALDOCK, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This case raises the question of whether a 1907–08 addition to the Navajo Reservation of nearly 1.9 million acres in northwestern New Mexico was terminated by two Executive Orders issued in 1908 and 1911.* The plaintiff-appellant is the Pittsburg and Midway Coal Mining Company ("P & M"), whose South McKinley mine is on the land in question and whose "source gains" from the mine's coal sales are taxed by the defendant Navajo Tribe Tax Commission ("Tribe"). P & M has paid the tax under protest since 1986. Reply Brief at 20 n. 17. P & M filed an action in federal court for an injunction and declaratory judgment that the Tribe lacked jurisdiction under federal law to tax the mine. The Tribe replied that the area in question was

---

* For purposes of argument and consideration, we companioned this case with that of *Blatchford v. Sullivan,* 904 F.2d 542, 547 (10th Cir.1990), in which this same issue is raised. The district court in *Blatchford* made findings of fact and conclusions of law contrary to those reached by the district court in this case. See note 7 *infra*. The findings and conclusions of the district court in *Blatchford* are attached to this opinion as Appendix B. The opinion of the district court in this case is attached as Appendix C.

still part of the Navajo Reservation and that, therefore, the federal court should abstain pursuant to the "Indian abstention doctrine" and allow the taxation question to be heard first in Tribal forums. The Tribe asserted that, even if the mine were not on the Reservation, the Indian abstention doctrine should still apply because the mine was within "Indian country" as defined by 18 U.S.C. § 1151. After a two-week evidentiary hearing, the trial court ruled that the mine was located within the Reservation boundaries and that, therefore, abstention properly precluded the court from ruling initially on the tax question. It dismissed P & M's causes of action without prejudice and did not reach the issue of whether the mine, even if outside the Reservation boundaries, was nonetheless within Indian country. P & M appeals this final order.[1] We conclude that the mine is not within the Reservation boundaries. Therefore, we reverse the decision of the trial court and remand for consideration of whether the mine, although outside the Reservation boundaries, is nonetheless within Indian country and, if so, whether the district court should abstain and allow the Navajo legal system to address the taxation issue first. The remainder of this opinion is organized as outlined:

I. Background

    A. History of the 1907–08 Addition to the Navajo Reservation

    B. The District Court Opinion

II. Legal Analysis

    A. Legal Standards

    B. General Intent of Executive Orders 709/744 and Subsequent Language "Restoring" Unallotted Lands "to the Public Domain"

      i. Restoration Language as Operative Language of Section Twenty-five and Executive Orders 1000/1284: Other Federal Court Cases Distinguished

      ii. Meaning of Restoration Language in Historical Context

      a. Interpretation of Congressional Restoration Language by the Federal Courts

      b. Executive Branch Interpretation of Restoration Language Prior to Executive Orders 1000/1284

      iii. Restoration Language in the Context of Executive Orders 709/744, Section Twenty-five, and Executive Orders 1000/1284: Legislative History and Surrounding Circumstances

      iv. Subsequent Congressional and Executive Action

      v. Summary

    C. Subsequent Demographics

    D. Specific Intent of Restoration Language with Respect to Allotted Lands

    E. Conclusion

## I. BACKGROUND

### A. *History of the 1907–08 Addition to the Navajo Reservation.*

The original Navajo Reservation in Arizona and New Mexico was created by the Treaty of 1868 and expanded by subsequent Executive Orders ("EOs"), particularly those of 1878, 1880, 1882, 1884, and 1900. Between 1868 and 1907, the Reservation grew from the three million acres provided in the Treaty to more than eleven and one-half million acres in Arizona, New Mexico, and Utah. Ex. 64 at 1–2.[2] Al-

---

**1.** Eight days after the district court issued its Memorandum Opinion and Order dismissing the case, the court issued a second order certifying the earlier Order for interlocutory appeal under 28 U.S.C. § 1292(b). P & M then appealed the second order in case we found that the court's original order was properly converted into an interlocutory order. The original order, rather than holding further federal proceedings in abeyance, dismissed all the causes of action without prejudice. For purposes of this appeal, we view the original order as a final order subject to appeal as of right. *See* 15 C. Wright,

A. Miller & E. Cooper, *Federal Practice and Procedure* §§ 3913, 3916 (1976); *cf. Klein v. Heckler,* 761 F.2d 1304, 1305 (9th Cir.1985) (dismissal for failure to exhaust administrative remedies is a final order giving jurisdiction to appellate court under 28 U.S.C. § 1291). We therefore deny P & M's petition No. 88–8071 and proceed under its original petition for review.

**2.** Numbered exhibits are those of P & M. Alphabetized exhibits are those of the Tribe. At times, the exhibits of both parties contain copies of the same document, in which case, for conve-

though extensive in area, the Reservation in 1907 represented far less land than the Navajos had used and occupied in previous centuries. The Reservation and land surrounding it were largely desert with limited water supplies, and the Navajos needed large amounts of territory to graze their sheep successfully. *See, e.g.*, Ex. 10 at 3–4.

In March 1907, the Superintendent of the Navajo Agency at Fort Defiance, Arizona, W.H. Harrison, raised with Interior Department officials the plight of Navajos living on public domain lands to the east and south of the Reservation, whose livelihood as sheep grazers was threatened by the encroachment of white and Mexican stockmen who were appropriating the limited water holes for themselves. *See* Exs. 6 at 2–3, 7 at 5–6, 10 at 4. Harrison asked the General Land Office to withdraw some 131 townships from general entry to allow Navajos on the land to receive 160–acre allotments in severalty without interference from white and Mexican stockmen. Ex. 6 at 2–3. The Commissioner of the General Land Office, R.A. Ballinger, declined to do so, Ex. 11 at 2–3, stating that the Navajos were sufficiently protected by the allotting process established under section four of the General Allotment Act of 1887, ch. 119, 24 Stat. 388, 389, as amended by the Act of February 28, 1891, ch. 383, 26 Stat. 794, 795 ("the General Allotment Act").[3] Alternatively, Superintendent Harrison suggested to Francis Leupp, the Commissioner of Indian Affairs,[4] that the grazing problem be solved either by (1) extending the Reservation into townships south and east of the existing Reservation and convincing the Santa Fe Railroad Company to exchange its holdings therein for others elsewhere, or (2) allotting the Indians all of the public

lands near existing or potential water storage facilities. Ex. 7 at 6.

By the time of the Harrison correspondence, the conflict between the public domain Navajos and white and Mexican stockmen was already sharply drawn. On March 6th of the same year, the Territorial Governor of New Mexico had written to Interior Secretary James Garfield, enclosing a joint memorial of the New Mexico Territorial Legislature urging the federal government to keep the Navajos within the boundaries of their Reservation and to stop them from appropriating water for their sheep on public domain lands. Ex. 10 at 7–10. On July 9, 1907, New Mexico Territorial Delegate to Congress W.H. Andrews wrote to the Acting Commissioner of Indian Affairs C.F. Larrabee protesting any enlargement or extension of the Reservation. Ex. 12 at 2. Larrabee responded that current Indian Office[5] policy was to break up tribal relations and integrate the Indians into the communities in which they lived by alloting them lands in severalty as provided for by the General Allotment Act. *Id.* at 6. In this way, Larrabee said, the Office could secure permanent homes for off-reservation Indians on public domain land. *Id.* In other words, he evaded the issue of whether any extension to the Reservation was under consideration.

Over the summer, Commissioner of Indian Affairs Leupp met with the Navajos in Council. It appears that Leupp—in contrast to Ballinger—accepted the view that withdrawal of the lands from the public domain was needed. *See* Exs. 13, 14. Leupp, however, told both the Navajos in Council and their staunch advocate Father Anselm Weber, a Franciscan priest at St. Michael's Mission near the Arizona–New Mexico line, that any recommendation to

---

nience, we generally cite to one rather than both.

**3.** Ballinger reasoned that because all applicants were "required to make affidavit that the land applied for is not occupied or improved by any Indian," the Indians were sufficiently protected. Ex. 11 at 2. Under section four the nomadic Navajos were required to take the initiative to file for allotment with the General Land Office and could seek allotment only for lands on which they had "made settlement."

**4.** Both the General Land Office and the Indian Office were subdivisions of the Department of the Interior. R. Vol. VII at 1255–56.

**5.** In the course of the history recited in this opinion, the Indian Office came to be called the Bureau of Indian Affairs. To avoid confusion, we stay with the term "Indian Office."

the President would be for only a temporary extension to the existing Reservation, limited to the purpose of completing the public domain allotments to the off-reservation Navajos without competition from other stockmen. *Id.* In August 1907, Leupp shared the same information with Superintendent Harrison, rejecting a permanent extension of the Reservation but supporting an extension for temporary purposes. Ex. 13. On November 6, 1907, Leupp recommended to Interior Secretary Garfield an EO temporarily withdrawing lands and adding them to the Reservation in order to protect the off-reservation Indians until they could receive the allotments to which they were entitled. Leupp noted that the Indians had lived in the area for generations and had abstained from violence even though they were being driven from their homes and watering sites by whites. An EO was seen as the appropriate mechanism to secure their grazing lands and watering holes, free from the competing demands of non-Indians. Ex. 15 at 3. Leupp's letter to Garfield contained a draft EO which became EO 709. Ex. 15 at 5–6.

Secretary Garfield wrote to President Theodore Roosevelt, recommending Leupp's proposed EO. Ex. 16. Garfield enclosed Leupp's November 6th recommendation, along with a copy of Superintendent Harrison's letter of September 14, 1907 describing the lands involved. He also enclosed a copy of Father Weber's letter of September 5, 1907 to Superintendent Harrison, in which Father Weber reiterated his and Harrison's common understanding that the extension was to be made "only for the purpose of allotment, and is to last only till the allotments are made." *Id.;* Ex. 14 at 3. The EO was signed on November 9, 1907 by President Roosevelt and issued as Executive Order 709, "withdrawing from sale and settlement" certain lands in New Mexico and Arizona to the east and south of the Navajo Reservation and setting them apart "as an addition to the present Navajo reservation." [6] Exec. Order No. 709 (1907)

*reprinted in* 3 C. Kappler, *Indian Affairs: Laws and Treaties,* 669 (1913).

Two months later, on January 28, 1908, the President issued EO 744, reducing the addition so that certain lands inadvertently included in the Navajo addition could be restored to the Jicarilla Reservation instead. *See* Exec. Order No. 744 (1908), *reprinted in* 3 C. Kappler, *supra,* at 669. The remaining extension to the Navajo Reservation was referred to as the 709/744 area and consisted of approximately seventy-nine townships (1.9 million acres) in New Mexico and forty-seven (one million acres) in Arizona. (See Appendix for a map of the 709/744 area.)

Predictably, political response in New Mexico to the 709/744 extension was unfavorable. Within a few short months Delegate Andrews was forwarding to the Interior Department letters and petitions from opponents to the extension and was pressuring the Interior Department for reassurance that no Indians would be allotted who were not already residing on the land. *See* Exs. 19, 20, FO. After being informed that a congressional resolution would be needed before the President could restore the unallotted 709/744 lands, Andrews asked the Department to prepare one. Ex. FO. Commissioner Leupp drafted a joint resolution to reopen the 709/744 extension to settlement and entry and "restore the surplus [i.e., unallotted] lands to the public domain." Exs. 22, 24 at 4. Before recommending passage of Andrews' joint resolution, the House Committee on Indian Affairs sought the opinion of the Interior Department's Office of Indian Affairs. The response from Acting Commissioner Larrabee was included in the Committee Report, and stated in pertinent part:

"[I]t was necessary, in order to protect them [public domain Navajos] in their homes that a *temporary reservation* of the lands be made until such time as the Indian occupants could be allotted. It was not and is not the intention of the

6. The withdrawal was made subject to valid existing rights. Among them was railroad title to odd-numbered sections in certain townships north of the Santa Fe railroad bed that were within the 709 area. Thus, the extension to the Reservation was, from its inception, checkerboarded with private railroad lands.

Department that lands which will not be needed for allotment purposes be withheld from settlement and entry any longer than will absolutely be necessary to insure the Indian's securing their homes under authority of law without interference from white settlers.

... [I]f the joint resolution should become a law it will be possible to restore the surplus lands to the public domain as fast·as the Indians in any particular tract have all been allotted."

H.R.Rep. No. 1663, 60th Cong, 1st Sess., 1–2 (1908) (emphasis added). The Committee reported that Larrabee's letter "authenticates the virtue of this resolution." *Id.* at 1. The Senate Report was virtually identical. *See* S.Rep. No. 681, 60th Cong., 1st Sess. (1908). The resolution was enacted into law as section twenty-five of the Act of May 29, 1908, ch. 216, 35 Stat. 444, 457.

Indications are that the Interior Department was in something of a hurry to complete the allotments. *See, e.g.,* Exs. 19 at 3, 39 at 9. Acting Commissioner Larrabee told the allotting agents in the field to first allot the area east of the New Mexico First Guide Meridian and at the earliest practicable date. Ex. 32 at 3. On December 30, 1908, less than fourteen months after EO 709 was issued, President Roosevelt issued EO 1000, which provided that the unallotted lands in the eastern third of the 709/744 area—east of the New Mexico First Guide Meridian—were "restored to the public domain" except for 110 allotments which had not been finally approved. Exec. Order 1000 (1908), *reprinted in* 3 C. Kappler, *supra,* at 685. Secretary Garfield's letter recommending EO 1000 focused on the need to reopen the lands to settlement and entry. *See* Ex. 35 at 3.

In 1909 the Taft Administration replaced the Roosevelt Administration, and R.A. Ballinger, the former Commissioner of the General Land Office, became the Interior Secretary. R.Vol. VII at 1295. At the time of the transition, the Interior Department established a separate agency and superintendency for the 709/744 area and the area further north of it in New Mexico. Ex. 84. The superintendent's jurisdiction was over all of the Navajos allotted or living on "public lands in New Mexico, east of the original Navajo Reservation; also those on the eastern Navajo extension established by [EOs 709/744]." Ex. FAC at 1. The area and agency were referred to as the Pueblo Bonito. From its inception, the Agency's jurisdiction extended not only to Navajos within the recently created 709/744 reservation but to those beyond it as well. The Pueblo Bonito Superintendent, Samuel Stacher, taking a policy position consistent with that of Navajo Agency Superintendent Harrison a few years before, urged the Interior Department to reconsider its position and not restore the remaining 709/744 area to the public domain or open it to settlement. Exs. 43 at 2–4, FAL–2. Also, Senator Curtis of Kansas urged the Department not to "throw open the remainder of the reservation." Ex. 46 at 1. Father Weber took the same position, fearing that opening of the reservation would deny to 709/744 Navajos the extended grazing lands necessary for their economic survival. Ex. 40 at 3–7. The Interior Department response, however, was that section twenty-five of the Act of May 29, 1908 ("section twenty-five") dictated restoration of the lands to the public domain after the allotments had been completed, and, therefore, its position did not change. Ex. 46 at 4.

Having been assured that the allotment work in New Mexico had been completed, Ex. 47 at 2, President Taft issued Executive Order 1284 on January 16, 1911, declaring that all remaining unallotted lands added to the Navajo Reservation in New Mexico by EOs 709/744 were "restored to the public domain." Exec. Order No. 1284 (1911), *reprinted in* 3 C. Kappler, *supra,* at 686. The time from the issuance of EO 709, adding to the Reservation, until the issuance of EO 1284, completing the restoration of unallotted lands to the public domain, was slightly over three years.

### B. *The District Court Opinion.*

In ruling that the New Mexico 709/744 area retained reservation status, the district court concluded that the absence of three kinds of statutory language was dispositive: (1) the absence of language in

section twenty-five (and EOs 1000/1284) explicitly mentioning reservation "boundaries," (2) the absence of "cession" language or other language of total surrender of all tribal interests, and (3) the lack of any statutory plan for congressional reimbursement for the opened land. District Court Opinion at 4. The court also observed that Presidents Roosevelt and Taft knew how to employ cancellation language in an EO rather than restoration language and had used it on at least one occasion apiece; to the court the absence of cancellation language indicated that the 709/744 boundaries remained intact. *Id.* at 6. Finally, the court did not read the events surrounding passage of the statute and issuance of the EOs as evidence of a widely held, contemporaneous understanding that the boundaries would shrink, primarily because it found no distinction between the temporary nature of the 709/744 area and the anticipated demise of the reservation system in general, and because the surrounding circumstances showed a focus on title rather than jurisdictional concerns. *Id.* at 7.

On appeal, P & M argues that the narrow and limited allotment purpose of the 709/744 extension was clear from the beginning, never wavered, and that the "restoration to the public domain" language in both section twenty-five and EOs 1000/1284 was operative language that was explicitly understood to be language diminishing or terminating the New Mexico 709/744 boundaries. The Tribe, on the other hand, supports the district court position, emphasizing that the actual language of the 709/744 orders never mentioned that the extension was temporary and arguing that "restoration to the public domain" language should be seen as no more than evidence of diminishment. In effect, it asserts that, in the context of the surrounding circumstances, the restoration language should be construed either as ambiguous or as limited to title concerns. *See* R.Vol. III at 369.

## II. LEGAL ANALYSIS

A. *Legal Standards.*

■ The Supreme Court has issued a number of pronouncements to guide lower court interpretations of statutes and EOs affecting the status of Indian reservations. First, it is well established that Congress has the power to diminish a reservation unilaterally, *Solem v. Bartlett*, 465 U.S. 463, 470 n. 11, 104 S.Ct. 1161, 1166, 79 L.Ed.2d 443 (1984) (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903)). Nonetheless, diminishment will not be lightly inferred. *Solem*, 465 U.S. at 472, 104 S.Ct. at 1167. Congress must clearly evince the intent to reduce boundaries, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 615, 97 S.Ct. 1361, 1377, 51 L.Ed.2d 660 (1977), and traditional solicitude for Indian rights favors the survival of reservation boundaries in the face of the opening up of reservation lands to settlement and entry by non-Indians. *Solem*, 465 U.S. at 472, 104 S.Ct. at 1167. Courts may not, however, "ignore plain language that, viewed in historical context and given a 'fair appraisal' clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 774, 105 S.Ct. 3420, 3432, 87 L.Ed.2d 542 (1985) (quoting *Washington v. Washington Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979)).

■ In the above cases the Supreme Court has applied, without comment, a *de novo* standard of review in determining congressional intent. *See also Ute Indian Tribe v. Utah*, 716 F.2d 1298, 1301 (trial conclusions are "persuasive," but not considered factual findings) (10th Cir.1983), *rev'd in part and aff'd in part en banc*, 773 F.2d 1087 (10th Cir.1985) (no discussion of standard of review), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The ascertainment of congressional intent is a matter of statutory construction, which typically involves a *de novo* review. To the extent that statutory construction turns on an historical record, however, it involves a mixed question of law and fact. Where a mixed question "primarily involves the consideration of legal principles,

then a *de novo* review by the appellate court is appropriate." *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir.1986). Such is the case here, where key district court legal conclusions, e.g., the need for explicit language mentioning boundary reduction or evidence of cession and compensation, "rest on an erroneous view of the law." *Pullman–Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).[7]

The issue before us is set in the context of the so-called "surplus land acts" passed by Congress in the 1890s and early 1900s. In those acts Congress dealt with the question of surplus reservation lands on a reservation-by-reservation basis after allotments in severalty to Indians had been largely completed as authorized by the General Allotment Act. In disposing of unallotted or surplus lands on reservations, Congress invoked a variety of phraseology, but generally did not distinguish between title and boundary concerns and, in fact, seemed oblivious to future disputes that might arise over Indian jurisdiction. Similarly, in the early federal court cases holding that a reservation had been diminished, potential problems that might arise from the fact that the remaining Indian lands were carved up in checkerboard fashion were not even acknowledged. *See, e.g., Starr v. Long Jim*, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670 (1913); *Collins v. Bubb*, 73 F. 735 (C.C.E.D.Wash.1896). Both Congress and the courts appear to have assumed, as did their contemporaries, that the reservation system would be short-lived. *See Solem v. Bartlett*, 465 U.S. at 468, 104 S.Ct. at 1165. They failed to foresee that Indian tribes would be self-governing bodies indefinitely, with a variety of quasi-sovereign powers, including taxing authority, within their reservation boundaries.

In the mid–1800s, when most Indian reservations were created, the lands typically were "reserved for occupation and use by the Indians" to protect the possession of the land for the Indians as wards of the federal government, until such time as they could be integrated into American society as full citizens. *See, e.g., Solem*, 465 U.S. at 466–67, 104 S.Ct. at 1163–64; *Navajo Tribe v. New Mexico*, 809 F.2d 1455, 1458 n. 5 (10th Cir.1987). When Congress extinguished Indian title to various reserved lands, the most natural construction of the abrogation was that the lands so affected were no longer available, i.e., no longer *reserved* for Indian possession and use, and, therefore, the old reservation boundaries no longer existed. The most obvious reason for congressional failure to distinguish between title and boundary (jurisdictional) interests is that Congress did not see a distinction and thought that both interests terminated when either one did; i.e., logically, if Congress had seen a distinction, it would have made clear what its intention was with respect to both. Yet since the demise of the reservations did not occur as expected, the Supreme Court, in disputes over reservation boundaries, has applied a long-standing presumption that ambiguous congressional action affecting the rights of Indians is to be resolved "to the benefit of the Indians." *See DeCoteau v. District County Court*, 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975); *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918).

■ Hindsight established that the distinction between title and boundary was an important one, and thus, the Supreme Court has required that specific congressional intent to diminish *boundaries* and

---

7. Were we to use a clearly erroneous standard for review of the historical record, we would find clear error in the district court's key factual findings with respect to the circumstances surrounding passage of section 25 and EOs 1000 and 1284. In this context, we note that in the companion case of *Blatchford v. Sullivan*, 904 F.2d 542 (10th Cir.1990), another judge in the federal district of New Mexico ruled that the

New Mexico 709/744 area had lost reservation status. In other words, two separate judges from the same federal district, using much of the same evidence, made directly contrary findings of fact and conclusions of law with respect to the same issue of reservation status (see Appendices B and C hereto). Those conflicting findings and rulings are simultaneously before us in our joint consideration of these cases.

not just Indian land titles be clearly established in each alleged diminishment statute whose meaning subsequently became a source of dispute. *See Solem*, 465 U.S. at 469, 104 S.Ct. at 1165. According to the Court, statutory "open to settlement" language alone does not clearly reflect congressional concern for boundaries because its language focuses on title concerns. *See, e.g., Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent*, 368 U.S. 351, 355, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962). The Court's specific intent requirement has the effect of negating consideration of the congressional presumption that all reservations were to be temporary and instead elevates another presumption that Congress intended to deal fairly with the Indians. In short, the presumption that all reservations would be temporary is irrelevant in determining whether the boundaries of a *specific* reservation were being diminished by the language of a given statute or EO.

To summarize, although around the turn of the century Congress anticipated the early demise of the reservation system, the Supreme Court has not extrapolated from this expectation a concomitant boundary diminishment in the passage of every surplus land act. *Solem*, 465 U.S. at 469, 104 S.Ct. at 1165. Instead it has examined each act on a case-by-case basis, holding that some of the acts diminished reservations and others did not. *Compare Solem*, 465 U.S. at 466–76, 104 S.Ct. at 1163–69; *Mattz*, 412 U.S. at 496–504, 93 S.Ct. at 2253–57; and *Seymour*, 368 U.S. at 354–57, 82 S.Ct. at 426–28 (each holding that the affected reservation lands had not been diminished by language opening them to sale and settlement) *with Rosebud Sioux Tribe*, 430 U.S. at 586–615, 97 S.Ct. at 1362–77; *DeCoteau*, 420 U.S. at 431–49, 95

S.Ct. at 1086–95 (both holding that the affected reservation lands had been diminished by language of cession and relinquishment), *and Oregon Dep't of Fish & Wildlife*, 473 U.S. at 766–74, 105 S.Ct. at 3428–32 (holding that former hunting and fishing rights within ceded lands had been terminated with the cession).

■■■■ The current analytic structure has been summarized in *Solem*. The overriding standard is that congressional intent at the time of the relevant statute governs. In determining intent, "[t]he effect of any given surplus land Act depends on the language of the Act and the circumstances underlying its passage." *Solem*, 465 U.S. at 469, 104 S.Ct. at 1165. The "operative" language of the statute is more powerful than incidental language embedded in secondary provisions of the statute. *Id.* at 472, 104 S.Ct. at 1167. In the presence of statutory language that would otherwise suggest unchanged reservation boundaries,[8] however, the Court is willing to infer a contrary congressional intent when events surrounding the passage of a surplus land Act "unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." *Id.* at 471, 104 S.Ct. at 1166.

■■■ In addition to explicit statutory language and surrounding circumstances, the Court is willing to look to subsequent events, including congressional action and the demographic history of the opened lands, for clues to whether Congress expected the reservation boundaries to be diminished. The Court suggests, however, that these latter factors will not substitute for failure of "an Act and its legislative history ... to provide substantial and compelling evidence of a congressional intention to diminish Indian lands...."[9] *Id.* at

8. Where the statutory language does not "suggest" unchanged boundaries but is simply ambivalent and could support an interpretation of either changed or unchanged boundaries, the *Solem* Court does not indicate whether unequivocal evidence of a widely held, contemporaneous understanding is needed or whether something less than unequivocal evidence is sufficient to resolve the ambiguity. We assume that

the evidence, if not unequivocal, must be substantial and compelling. *See Solem*, 465 U.S. at 472, 104 S.Ct. at 1167.

9. We assume that such factors also will not substitute for failure of the surrounding circumstances to provide substantial and compelling, if not unequivocal, evidence where an Act and its legislative history provide less than substantial

472, 104 S.Ct. at 1167. In other words, subsequent events and demographic history can support and confirm other evidence but cannot stand on their own; by the same token they cannot undermine substantial and compelling evidence from an Act and events surrounding its passage.

### B. *General Intent of EOs 709/744 and Language "Restoring" Unallotted Lands "to the Public Domain".*

With these standards in mind, we first determine whether EOs 709/744 explicitly established a permanent reservation addition. We must then determine whether the "restore to the public domain" language in section twenty-five authorized diminishment or termination of the reservation boundaries of the 709/744 area.[10] If so, the same restoration language in EOs 1000/1284 effectuated the diminishment or termination of the New Mexico portion of the 709/744 area. To determine congressional intent, we look to explicit statutory language, to the common meaning of the phrase "restore to the public domain" in

and compelling evidence. Why the Court did not mention the "surrounding circumstances" in this context along with legislative history is unclear. It is unlikely that what the Court gave with one hand (a standard requiring analysis of the surrounding circumstances where an Act suggests unchanged boundaries), it would take away with the other by precluding "substantial and compelling evidence" provided by the surrounding circumstances. Especially where the legislative history contained in congressional documents is sparse, as is the case here, the surrounding circumstances can be critical to a determination of congressional intent. Of course, it may be that the term "legislative history" in *Solem* was meant to include not only congressional documents and debate but all other relevant documents and circumstances leading up to legislative action. In any event, we interpret the "substantial and compelling evidence" standard in *Solem* to include evidence provided by both the legislative history and the surrounding circumstances. *See Mattz v. Arnett,* 412 U.S. at 505, 93 S.Ct. at 2258 (if statute is not clear on its face, the Court looks to the surrounding circumstances *and* to legislative history), on which *Solem* relied.

10. The term diminishment refers to a reduction in the overall size of the New Mexico 709/744 reservation area. Termination refers to extinction of the reservation in the New Mexico 709/744 area. We defer until section D of this opinion discussion of which one Congress intended to effectuate.

the years 1907–11, and to the specific circumstances surrounding its use in section twenty-five.

The Tribe asserts that the absence of the word "temporary" in EO 709 demonstrates that the reservation addition was meant to be permanent. We reject this assertion because, as discussed above, Supreme Court precedent establishes that intent can be ascertained from outside evidence where statutory language (or, presumably, EO language as well) suggests that boundaries were permanent. We also note that absence of the term "temporary" from EOs setting aside land as an Indian reservation has not prevented the Supreme Court from holding in the past that certain of such reservations conveyed only temporary and limited possessory interests in the lands affected. *See Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 176, 67 S.Ct. 650, 653, 91 L.Ed. 823 (1947);[11] *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942).[12] In both *Confederated*

11. In *Confederated Bands,* lands were set aside in an 1875 EO "'as an addition to the present reservation'" and in an EO of 1882 were "'restored to the public domain.'" *Confederated Bands,* 330 U.S. at 173 n. 1, 174, 67 S.Ct. at 652 n. 1, (quoting Exec. Orders of Nov. 22, 1875 and Aug. 4, 1882, *reprinted in* 1 C. Kappler, *Indian Affairs: Laws and Treaties,* 834–35 (2d ed. 1904)). The case concerned the impact of a mistaken boundary survey, which had led the President inadvertently in his 1875 EO to add land to the Ute Reservation beyond that provided for in the Treaty of 1868. The Court concluded that (1) the President had no authority to convey to the Utes a compensable interest in the lands lying north of the true 1868 treaty boundary, (2) Congress had never intended title to flow to the Utes for any lands north of the treaty boundary, and (3) the EO was simply trying to give back to the Utes the land mistakenly excluded by the incorrect survey. Notably, executive as well as congressional intent was important to the outcome.

12. *Sioux* considered whether the Sioux Tribe should have been compensated for loss of its alleged interest in some five and one-half million acres set aside as an addition to its present reservation in four EOs of 1875 and 1876 and then restored to the public domain by EOs of 1879 and 1884. *Sioux,* 316 U.S. at 320–23, 62 S.Ct. at 1096–98. The Court held that Congress had not intended the four EOs of 1875–76 to

*Bands* and *Sioux,* the Court concluded that no title interests had passed to the tribes. Interestingly, *Sioux* cites to various pages, including page 21, of U.S. Department of the Interior, *Executive Orders Relating to Indian Reservations* (1912), noting that neither the Government nor the Indians suggested that any compensation was due under the EOs on those pages and inferring that those EOs did not pass the same interest that was conveyed by statute or treaty. *See Sioux,* 316 U.S. at 330 n. 15, 62 S.Ct. at 1101 n. 15. Page 21 contains a copy of EO 1000, at issue here. Because the explicit language of EOs 709/744. does not establish that the 709/744 area was established as a temporary reservation, we must analyze the circumstances surrounding their issuance.

The Tribe also argues that the intended permanence of EO 709 is reflected in the fact that congressional authorization was required for restoration of the unallotted lands, inferring that if the EO were temporary, the President could have terminated it without congressional authorization. No legal authority is offered for this argument. The Tribe also asserts that section twenty-five ratified the alleged permanence of EOs 709/744 and authorized the restoration of unallotted lands for title purposes only. At most, the explicit language of section twenty-five *may suggest* that the boundaries were to remain unaffected by the restoration of title, that is, if the phrase

"restored to the public domain" is limited to title concerns. Accepting the latent ambiguity of restoration language, we proceed to examine it more closely for clarification of its statutory context in section twenty-five and its historical usage. Then we analyze it in the context of the relevant legislative history and surrounding circumstances to see if there is unequivocal evidence of a widely held, contemporaneous view that the 709/744 boundaries would shrink.

i. *Restoration Language as Operative Language of Section twenty-five and EOs 1000/1284: Other Federal Court Cases Distinguished*

Preliminarily, we observe that the phrase "restore to the public domain" is clearly operative language in section twenty-five and not incidental language. Section twenty-five states:

"That whenever the President is satisfied that all the Indians in any part of the Navajo Reservation in New Mexico and Arizona created by Executive orders of November ninth, nineteen hundred and seven, and January twenty-eighth, nineteen hundred and eight, have been allotted, the surplus lands in such part of the reservation shall be restored to the public domain and opened to settlement and entry by proclamation of the President."

Act of May 29, 1908, ch. 216, § 25, 35 Stat. 444, 457.[13] The statute contains two opera-

---

convey tribal title to the land, thus differentiating the particular EO reservations from those established by statute or treaty. *Id.* at 331, 62 S.Ct. at 1101. That Congress never intended tribal title to pass by EO was evidenced by the fact that it was common practice not to award compensation when the existence of a reservation was canceled by EO, that the executive branch itself viewed Indian interests as less than those established by treaty or statute, that the Senate Committee on Indian Affairs shared a similar understanding, and that the General Allotment Act should not be read to suggest otherwise. *Id.* at 326–30, 62 S.Ct. at 1099–1101. The Court observed that the additions were created for the limited purpose of suppressing illegal liquor traffic among the Indians. When the *illegal traffic became otherwise preventable* (through a law establishing penalties), the Commissioner of Indian Affairs wrote to the Interior Secretary that the "'necessity for so large a

reservation ... does not now exist.'" *Id.* at 322, 62 S.Ct. at 1097 (quoting Letter from Commissioner to Secretary of the Interior dated June 27, 1879). The Court also observed that Congress had provided in the Indian Appropriations Act of 1877, ch. 289, 19 Stat. 176, 192, adopted August 15, 1876 (prior to the EO of 1876 but after the three EOs of 1875) that no appropriation for the subsistence of the Sioux was to be made unless they agreed to relinquish all right and claim to any country *outside the boundaries of the permanent reservation established by the Treaty of 1868.*

**13.** Restoration language is also the operative language of EOs 1000 and 1284. Executive Order 1000 of December 30, 1908 reads in pertinent part:

"It is hereby ordered that the unallotted lands [in certain townships in New Mexico east of the New Mexico First Guide Meridian], with-

tive phrases: (1) "restored to the public domain," and (2) "opened to settlement and entry." Whether their meanings are synonymous is at issue here, but that both phrases are at the heart of the statute is obvious from its face. This fact alone differentiates this case from *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), and other federal court cases dealing with diminishment, none of which controls the disposition of the case before us and all of which are distinguishable.

In *Solem*, the operative language of the relevant statute authorized the Interior Secretary to " 'sell and dispose' " of a portion of the Cheyenne River and Standing Rock Indian Reservations in North and South Dakota and to deposit the proceeds " 'to the credit of the Indians [having tribal rights on those reservations.]' " *Id.* at 472–73, 104 S.Ct. at 1167 (quoting Act of May 29, 1908, ch. 218, §§ 1, 6, 35 Stat. 460–61, 463). The Court concluded that the Secretary was "simply being authorized to act as the Tribe's sales agent." *Solem*, 465 U.S. at 473, 104 S.Ct. at 1167. Although at one point the statute referred to the reservations as " 'thus diminished,' " *Solem*, 465 U.S. at 474, 104 S.Ct. at 1168 (quoting Act of May 29, 1908, § 2, 35 Stat. at 461), the Court concluded that the reference did not make clear whether it was a reference to the boundaries of the reservations or simply to the extent of lands available for Indian occupancy. And although the statute stated that tribal members could harvest timber within the opened lands " 'only

as long as the lands remain part of the public domain,' " *Solem*, 465 U.S. at 475, 104 S.Ct. at 1168 (quoting Act of May 29, 1908, § 9, 35 Stat. at 464), thereby assuming that the opened lands had been returned to the public domain, the Court noted that the phrase may have referred only to the fact that the lands were to be open to settlement.[14] Therefore, the Court concluded that these terms, appearing in separate and incidental sections of the statute and capable of being interpreted in more than one manner, "cannot carry the burden of establishing an express congressional purpose to diminish" when weighed alongside the more limited express goal of opening up reservation lands for sale to non-Indians. *Solem*, 465 U.S. at 475, 104 S.Ct. at 1168. In short, when the act as a whole and its operative language clearly focus on land disposal rather than reservation diminishment, the statute cannot be said to diminish the reservation boundaries. Moreover, the Court's exploration of the circumstances surrounding passage of the statute confirmed its conclusion that the reservation had not been diminished. *Id.* at 476–78, 104 S.Ct. at 1169–70.

The Tribe analogizes the present case to *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), and *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), each holding no diminishment occurred. Both cases, however, construed "opened for settlement" language rather than "restore to the public domain" language. The *Seymour* Court held that reservation boundaries were pre-

drawn from sale and settlement, and set apart for the use of the Indians as an addition to the Navajo Reservation by Executive Orders dated November nine, nineteen hundred and seven, and January twenty-eight, nineteen hundred and eight, be, and the same are hereby, restored to the public domain, except the following described lands embracing one hundred and ten unapproved allotments...."
Exec. Order 1000 (1908), *reprinted in* 3 C. Kappler, *Indian Affairs: Laws and Treaties* 685 (1913). Executive Order 1284 of January 16, 1911 reads:
"It is hereby ordered that all lands not allotted to Indians or otherwise reserved within the townships in New Mexico added to the Navajo Reservation by Executive Orders of November nine, nineteen hundred and seven, and Janu-

ary twenty-eight, nineteen hundred and eight, lying west of the first guide meridian west, be and the same hereby are restored to the public domain."
Exec. Order 1284 (1911), *reprinted in* 3 C. Kappler, *supra*, at 686.

**14.** In other words, tribal members could not harvest timber on opened lands after they were sold to settlers because then those lands would no longer be in the public domain but rather in private ownership. The point is that the contextual focus of the term "public domain" seems to be on entry and settlement by non-Indians, and not on reservation boundaries. The phrase is not part of operative restoration language in the statute, since the statute never "restored to the public domain" the land in question.

served in a 1906 act that opened the southern half of the Colville Reservation to settlement and entry.[15] Similarly, *Mattz* explored the circumstances surrounding an 1892 act "opening" the Klamath River Reservation. The Court observed that the Act was substituted for a series of earlier (1879–1884) efforts in the House of Representatives to terminate the reservation, efforts resisted by the U.S. Senate. The 1892 Act adopted the Senate language. In both *Mattz* and *Seymour* the Court found that subsequent events supported its conclusion that Congress did not intend to diminish the reservation lands in question.

Like *Seymour* and *Mattz*, neither of two subsequent cases, *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), and *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), concerned statutes using restoration language. Unlike *Seymour* and *Mattz*, however, both subsequent cases held that reservation boundaries had been extinguished. Instead of opened-for-settlement language, cession language was the operative language. That is, the statutes stated that the respective tribes agreed to "cede" or "sell" certain reservation lands, and each statute provided for payment to the respective Tribe for the value of the ceded lands. *Rosebud Sioux Tribe*, 430 U.S. at 597, 97 S.Ct. at 1368 (quoting Act of April 23, 1904, ch. 1484, 33 Stat. 254, 256); *DeCoteau*, 420 U.S. at 439 n. 22, 95 S.Ct. at 1090 n. 22 (quoting Act of March 3, 1891, ch. 543, 26 Stat. 989, 1036). These facts were deemed conclusive of Tribal relinquishment of juris-

diction as well as title.[16] We do not have such clear language of cession and compensation before us in this case.

A recent Tenth Circuit case, *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (10th Cir.1985) (en banc), is distinguishable as well. Diminishment issues were raised in *Ute* with respect to the Uintah and Uncompahgre Reservations in Utah. We held that a section of the Appropriations Act of 1905 opening the Uintah Reservation to non-Indian settlers was insufficient to establish congressional intent to diminish or disestablish the reservation. We observed that earlier statutory language had provided for the surplus land to be restored to the public domain if the Tribe's consent could be obtained. That consent was not forthcoming, and the congressional language used in the 1905 Act, "as contrasted with its use of 'public domain' [restoration] language in the 1902 Act, is evidence of a clear retreat from any desire to effect a wholesale diminishment of the Reservation." *Id.* at 1089 (quoting Indian Appropriations Act of 1902, ch. 888, 32 Stat. 245, 263). In other words, restoration language was not the operative language of the statute being construed, although we were willing to infer that such restoration language would have effected a wholesale diminishment of the Uintah Reservation. Similarly, we held that language in the 1905 Act setting apart and reserving one million acres for the Uintah Forest Reserve prior to "'opening'" the Uintah Indian Reservation did not diminish the boundaries of the reservation. *Ute Indian Tribe*, 773 F.2d at 1090

---

**15.** In *Seymour*, the Court noted the difference between the 1906 statutory language and 1892 language vacating the north half of the reservation and restoring it to the public domain. The Court also noted that proceeds from the 1906 act were deposited to the credit of the Indians having tribal rights on the Colville Indian Reservation, whereas the 1892 Act had provided that Congress could appropriate the net proceeds for general public use.

**16.** Notably, *United States v. Grey Bear*, 828 F.2d 1286 (8th Cir.), *vacated in part* and *reh'g granted en banc*, 836 F.2d 1088 (8th Cir.1987) (vacated only with respect to prejudicial misjoinder issue and reinstated in subsequent rehearing, 863 F.2d 572 (8th Cir.1988)), did not find cession

language alone to be sufficient to disestablish. The Devils Lake Reservation at stake in *Grey Bear* was established by the Act of March 2, 1889. The government argued that it had been disestablished by treaty and by the Act of April 27, 1904, ch. 1620, 33 Stat. 319, 321, both of which provided that the Devils Lake Indians "hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Devils Lake Indian Reservation now remaining unallotted,...." Notwithstanding this clear language of cession, the court found that the statute did not contain an unconditional commitment to pay the tribe for ceded lands and, therefore, did not extinguish jurisdictional boundaries.

(quoting Indian Appropriations Act of 1905, ch. 1479, 33 Stat. 1048, 1070). After examination of the statutory language, legislative history, and subsequent events, we concluded that withdrawal of forest lands for administration by the Department of Agriculture could be consistent with continued reservation status. Again, no restoration language was present. *Ute Indian Tribe,* 773 F.2d at 1090.

Finally, we held in *Ute* that the Uncompahgre Reservation had not been diminished by an 1897 act which opened unallotted lands " 'for location and entry under all the land laws of the United States.' " *Id.* at 1092 (quoting Indian Appropriations Act of 1897, ch. 3, 30 Stat. 62, 87). An earlier statute had authorized that portions " 'unsuited' " or " 'not ... required for allotments ...,' by proclamation, be restored to the public domain and made subject to entry as hereinafter provided.' " *Ute Indian Tribe,* 773 F.2d at 1091 n. 3 (quoting Indian Appropriations Act of 1894, ch. 290, § 20, 28 Stat. 286, 337). We did not find that the 1894 statute provided a baseline for interpreting the 1897 statute, stating in addition that: "[T]he phrase 'restore to the public domain' is not the same as a congressional state of mind to disestablish. In other words, it doesn't disturb the *ownership* of land by the tribal group." *Ute Indian Tribe,* 773 F.2d at 1092 (emphasis added). The latter sentence is imprecise, because restoration to the public domain unmistakably disturbs *ownership* by the tribal

group, i.e., if title passes to non-Indians as a result of the restoration of certain lands, then ownership of the land is affected. What is arguably not disturbed is tribal jurisdiction over the lands, i.e., if private fee lands are still within the reservation, then the tribe presumably has jurisdiction over them for some purposes. Subsequent sentences clarify that we saw two alternative constructions of the phrase "restore to the public domain," the first limited to title and the second extending to both title and jurisdiction. *See id.* Our conclusion in *Ute* that the generic phrase was ambiguous is undercut, however, by our conflicting statement earlier in the same opinion that public domain language implies "a wholesale diminishment of the Reservation." *Id.* at 1089. Moreover, our conclusion is unexamined and unsupported in the opinion. Furthermore, we view the comments about restoration language as extraneous because restoration language was not the operative language of the statutes being construed, unlike the situation now before us.[17]

In summary, none of the arguably analogous Supreme Court cases nor the *Ute* case involved the need to construe the meaning of the phrase "restore to the public domain" when used as the operative language of the statute at issue. And none, therefore, addressed the additional question of whether the phrase is ambiguous when unaccompanied by language of ces-

---

**17.** The concurrence in *Ute,* in which a majority of the en banc court joined, emphasizes the difference between the 1894 and 1897 statutory language affecting the Uncompahgre Reservation as well as the strenuous objection of the Uncompahgres at the time to the terms of the 1894 statute. *Ute Indian Tribe,* 773 F.2d at 1095–96 (Seymour, J., concurring). While the concurrence interprets *Solem* to stand for the proposition that " 'public domain' language standing alone is insufficient to support a finding of explicit congressional intent to disestablish," *id.* at 1095, this interpretation ignores the fact that the statute construed in *Solem* did not contain operative language restoring Indian lands to the public domain. At the same time, the concurrence acknowledges that Congress was "completely clear when it terminated Uintah rights in the Gilsonite Strip." *Id.* at 1098. The method used by Congress to terminate Uintah rights in the strip was to declare the lands

"to be public lands of the United States and restored to the public domain," the restoration to take effect upon ratification by ¾ of the male Indians on the reservation, with proceeds from the sale of the affected lands to be held in trust for the Indians. Act of May 24, 1888, ch. 310, 25 Stat. 157–58. We take judicial notice of the fact that after *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) (holding that Congress could terminate a reservation unilaterally), ratification by any affected Indian Tribe was no longer necessary. Thus, the need for Indian ratification does not apply in the context of this case. As Commissioner of Indian Affairs Francis Leupp stated: "From the 5th of January, 1903, the date of the Lone Wolf decision, to the present day, no more agreements have been made or sought with the Indians preliminary to the opening of a reservation." F. Leupp, *The Indian and His Problem* 84 (1910).

sion and reimbursement, or other language clearly addressing reservation boundaries. We must, therefore, analyze how this phrase is to be construed in such a context and must examine how the phrase, standing alone, was understood at the time and what the specific circumstances were surrounding its use in section 25 and EOs 1000/1284.

### ii. *Meaning of Restoration Language in Historical Context*

In determining the meaning of words and phrases, commonly understood dictionary meanings can be a helpful starting point. According to Webster's Unabridged Dictionary 1128 (1909), "restore" meant "to give or bring back, as that which has been lost; to bring back to the owner; to replace." A more modern dictionary definition of "restore" is to bring back or put back into a former or original state. *See Webster's Third New International Dictionary* 1936 (1981). The question arises as to what the nature and function of that original state was. Can land returned to the public domain for purposes of sale and settlement simultaneously continue to be reserved land for jurisdictional purposes, or are the concepts mutually exclusive? Webster's dictionary from the relevant time period gives the legal definition of "domain" as "ownership of land; an estate or patrimony which one has in his own right; absolute proprietorship; paramount or sovereign ownership." *Webster's Unabridged Dictionary* 403 (1909). Within the definition of "domain," the phrase "public domain" is singled out and defined as "the territory belonging to a state or to the general government; public lands." *Id.* The terms "domain" and "public domain" are not explicitly limited to possession and title ownership and seem to include the notion of control for all sovereign purposes.

Obviously, what Congress and the Executive intended at the time by the words "restore to the public domain" cannot be determined merely from dictionary definitions, which do not clearly resolve the potential ambiguity with respect to title and jurisdiction. In some statutes and EOs, the potential ambiguity of the phrase is resolved by the use of additional language explicitly destroying reservation boundaries. That is, some EOs and statutes "cancel," "vacate," "discontinue," or "abandon" a reservation or a portion thereof and then restore it to the public domain. This linguistic structure is parallel to many statutes and EOs *creating* reservations by first withdrawing land (from either the public domain or from settlement and entry) and then establishing a reservation or adding to an existing one.

Our job here would be easy were such a verb present in section twenty-five and EOs 1000/1284. For instance, language that "vacated and restored [reservation lands] to the public domain" has been interpreted as clear language of extinguishment by the Supreme Court. *See Mattz v. Arnett,* 412 U.S. 481, 505 n. 22, 93 S.Ct. 2245, 2258 n. 22, 37 L.Ed.2d 92 (1973) (noting that vacate and restore to public domain is "clear language of express termination"); *Seymour v. Superintendent,* 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346 (1962) (noting that above language had terminated the northern half of the Colville Reservation); *Collins v. Bubb,* 73 F. 735, 738 (C.C.E.D. Wash. 1896) (holding that "vacate and restore" language terminated north half of Colville Reservation). Section twenty-five and EOs 1000/1284 did not, however, use the term "vacate" or some similar verb prior to use of the phrase "restore to the public domain," and we must determine whether the absence of such a word is a fatal omission. What are we to make of restoration language standing alone? Can we determine whether it was linked exclusively to termination of Indian title interests or was also linked to extinction or diminishment of reservation boundaries?

As the following analysis will reveal, restoration language, when used alone as operative language, clearly has been linked to termination in numerous factual settings. Although in some early Supreme Court cases, restoration language appears in the factual context of title disputes, in a number of other factual contexts the Supreme Court has concluded that the term was

linked to both. Furthermore, often one can deduce a tie to boundaries from the fact that there was a widely held contemporaneous understanding among the Indians and United States government that the boundaries were to be extinguished following use of the phrase as an operative phrase. Finally, one can deduce from linguistic analysis that Congress and the Executive Branch, when using the phrase as an operative phrase in statutes and EOs, frequently were linking it to boundaries as well as title. Since these deductions are largely based on inferential evidence and are not based on the universe of restoration statutes and EOs, we do not ground our decision in this case on construction of the operative phrase as an accepted term of art comprehending both title and boundary diminishment. Nonetheless, examination of the historical use of the term is both instructive and influential. The district court undertook no such examination.

### a. Interpretation of Congressional Restoration Language by the Federal Courts

Initially, we note that the early Supreme Court cases dealing with public lands neither refute nor establish that the phrase "restore to the public domain" was a term of art employed by Congress to cancel jurisdiction as well as title interests. *See Missouri, Kan., & Tex. Ry. Co. v. Roberts*, 152 U.S. 114, 119, 14 S.Ct. 496, 498, 38 L.Ed. 377 (1894); *Leavenworth, Lawrence, & Galveston R.R. Co. v. United States*, 92 U.S. 733, 745–46, 23 L.Ed. 634 (1876) (creation of an Indian reservation removes it from the public *lands* and consequently from disposal in the usual way, e.g., sale or preemption). *See generally Scott v. Carew*, 196 U.S. 100, 114, 25 S.Ct. 193, 198, 49 L.Ed. 403 (1905); *Wilcox v. Jackson*, 38 U.S. (13 Pet.) 498, 511–12, 10 L.Ed. 264 (1839) (designating land for a particular use removes or withdraws it from public *lands*). The phraseology in all four cases is removal from or restoration to the "public lands" and not the public domain. As-

suming the terms are synonymous, the cases link the term contextually only with title concerns; jurisdictional implications were not excluded but simply were not raised.

Comparably, *Starr v. Long Jim*, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670 (1913), does not address boundary concerns. Under the Act of July 4, 1884, ch. 180, 23 Stat. 76, 79, the Secretary of Interior was to assure that Indians who chose to remain on the Columbia Reservation selected lands in as compact a form as possible, with the remainder to be restored to the public domain. The issue in the case was not diminishment, however, but whether Long Jim could convey legal title in his retained allotment under the Act. The Court held that the federal government retained legal title to the allotted land. There was no dicta as to whether Congress intended the boundaries to be terminated by its statutory language authorizing that surplus lands be restored to the public domain.

In contrast, more recent Supreme Court cases assume in dicta that congressional restoration language extinguished boundaries. *Mattz v. Arnett*, 412 U.S. 481, 490, 93 S.Ct. 2245, 2250, 37 L.Ed.2d 92 (1973), cites language from the Indian Appropriations Act of July 27, 1868, ch. CCXLVIII, 15 Stat. 198, 223, (Congress restored Mendocino Reservation lands "to the public lands") as clear and sufficient language of extinguishment of reservation boundaries. Similarly, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 589 n. 5, 600, 97 S.Ct. 1361, 1364 n. 5, 1370, 51 L.Ed.2d 660 (1977), accepted restoration language in the Act of March 2, 1889, ch. 405, § 21, 25 Stat. 888, 896 (portion of the Great Sioux Reservation "restored to the public domain") as language demonstrating congressional intent to extinguish prior boundaries. Even Justice Marshall's dissent in *Rosebud* acknowledges that section twenty-one of the Act of March 2, 1889 expressly disestablished part of the Great Sioux Reservation by restoring it to the public domain.[18] *Rosebud*

---

**18.** Justice Marshall also authored the *Solem* opinion several years later, but we see nothing in *Solem* undercutting his view in his *Rosebud* dissent that the section twenty-one language disestablished the Great Sioux Reservation. Section twenty-one of the Act specified that all

*Sioux Tribe,* 430 U.S. at 618, 97 S.Ct. at 1379 (Marshall, J., dissenting). Furthermore, in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), Justice White's majority opinion (holding that cession of Lake Traverse Indian Reservation lands disestablished the reservation boundaries) assumed that restoration language was the equivalent of extinguishment of reservation status for the lands affected. The Court stated: "That the lands ceded ... were *returned to the public domain, stripped of reservation status,* can hardly be questioned.... The sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the 'public domain.'" *DeCoteau,* 420 U.S. at 446, 95 S.Ct. at 1094 (emphasis added).[19]

Other Supreme Court cases suggest that affected Indian Tribes understood EO restoration language to be language cancelling former EOs.[20] In *Sioux Tribe of Indians v. United States,* 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), the Sioux sought compensation for the value of lands "restored to the public domain" but did not contest in that action, or any other of

which we are aware, the fact that whatever Tribal interest had been created by additions to the Great Sioux Reservation under EOs of 1875 and 1876 had been terminated by the restoration language of the subsequent EOs of 1879 and 1884. (The Court itself viewed such language as the equivalent of "cancelling or revoking" an EO establishing a Reservation or adding thereto. *Sioux,* 316 U.S. at 330, 62 S.Ct. at 1101.) *See also Confederated Bands of Ute Indians v. United States,* 330 U.S. 169, 176, 67 S.Ct. 650, 653, 91 L.Ed. 823 (1947).[21]

Evidence that lower courts have accepted the view that restoration language is synonymous with extinction of reservation status is found in *Russ v. Wilkins,* 410 F.Supp. 579 (N.D.Cal.1976). "On many occasions Congress has unilaterally terminated sections of reservations by restoring them to the public domain.... The Act of 1873 [pertaining to the Round Valley Reservation in California] specifically 'restored to the public lands' the 12,000 acres it severed from the Reservation." *Id.* at 581. The court found that a subsequent 1905 act failing to employ restoration language did not terminate the reservation in question.[22]

---

lands outside of six designated reservations (carved out of the larger reservation) were "restored to the public domain" except for three islands that were given to municipalities for public parks. In context at least, it seems clear that the former Great Sioux Reservation was being diminished in size and that the restoration language was the operative language signaling the diminishment.

19. The sponsors of the legislation, in addition to clearly indicating that the statute extinguished Indian title "'to a great domain,'" also referred to the statute as carrying out agreements made with the Indians "'for the surrender of a large portion of their reservations to the public domain.'" *DeCoteau,* 420 U.S. at 440–41, 95 S.Ct. at 1091 (quoting 22 Cong. Rec. 3784, 3879 (1891) (remarks of, respectively, Representative Perkins and Senator Dawes)). The references speak to both title and jurisdictional concerns.

20. We note at this point that the National Indian Law Library compilation of allotment/cession statutes (cited in Justice Marshall's *Rosebud* dissent, 430 U.S. at 618 n. 3, 97 S.Ct. at 1364 n. 3), states that "restored to the public domain" statutes are those appearing to have "the clearest language of disestablishment." Doc. No. 002279 at 2. The compilation lists section 25 as a

statute of that type. *Id.* at Table E. Of course, as with other subsequent Indian interpretations of restoration language, this does not necessarily demonstrate that Congress so understood the term at the time, but it does nothing to undermine this proposition.

21. In *Navajo Tribe of Indians v. New Mexico,* 809 F.2d 1455 (10th Cir.1987), we observed that "the Navajo Tribe apparently concedes in this case that the [restore to the public domain] phrase in Executive Orders 1000 and 1284 was intended to disestablish the addition to the Navajo Reservation created by Executive Order 709, as amended by Executive Order 744." *Id.* at 1459 n. 7. In *Navajo Tribe,* the Tribe sought to establish equitable title in the unallotted lands by virtue of the fact that the EOs were issued before the Indian allotments were completed and thus were void for failure to comply with section twenty-five. The court held that the Tribe's title claim was time barred. What the Tribe apparently conceded in its title claim it pursues here in its jurisdiction claim.

22. The Ninth Circuit reversed, finding that even in the absence of such explicit language the surrounding circumstances revealed clear Congressional intent to redraw the boundaries of

In summary, federal court cases reveal that neither Congress, the courts, nor Indian tribes themselves have insisted that restoration language be accompanied by more explicit cancellation language. Rather, they have used or accepted simple, operative restoration language as language of reservation termination in many situations. We have found no case where operative restoration language was not accepted as language of termination.

b. *Executive Branch Interpretation of Restoration Language Prior to EOs 1000/1284*

Language restoring lands to the public domain was used over and over again in EOs in the decades preceding the statute and EOs in question here. Various predecessors of Presidents Roosevelt and Taft, including Ulysses S. Grant, Rutherford B. Hayes, Chester A. Arthur, Grover Cleveland, and Benjamin Harrison used the phrase frequently as the operative phrase of an EO. *See* 1 C. Kappler, *Indian Affairs: Laws and Treaties* 830–875 (2d ed. 1904). A study of executive branch usage of the phrase is helpful in ascertaining its meaning to Congress, especially where there is no evidence that Congress and the Executive held different interpretations. *Cf. Rosebud Sioux Tribe v. Kneip*, 521

F.2d 87, 91 (8th Cir.1975), *aff'd*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (official correspondence, administrative treatment, materials bearing on the historical context of passage of legislation are relevant to congressional intent).[23]

We begin with the Public Land Commission's history of the public domain, commissioned by Congress and issued in 1880. U.S. Pub. Land Comm'n, *The Public Domain* (1880). In the chapter on Indian reservations, the document gives the procedure for "abolishing" an Indian reservation. It states: "When [an EO] reservation is no longer required, and the President is so informed by the Secretary of Interior, an Executive order is issued restoring the lands to the public domain ..., after which the lands are disposed of as other public lands." *Id.* at 243–44. In contrast, the document states that an Indian reservation "existing by virtue of treaty stipulations" is usually abolished in another manner, i.e., by agreement between the Indians and Interior Department officials to relinquish the affected lands for valuable consideration, and subsequent ratification by Congress. *Id.* at 244. In other words, the abolition of an EO reservation was not seen to require either ratification by the Indians or by Congress. The Supreme Court shortly thereafter referenced the Commission's

the reservation. *Russ v. Wilkins*, 624 F.2d 914, 917–20, 926 (9th Cir.1980), *cert. denied*, 451 U.S. 908, 101 S.Ct. 1976, 68 L.Ed.2d 296 (1981).

**23.** We note that, to date, the requirement that congressional intent governs has been applied by the Supreme Court in the context of the *statutory* creation or diminishment of reservation lands. *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909), is the seminal case, to which subsequent cases refer. In *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), and *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), although the reservations were created by EOs, the Court was construing congressional statutes purporting to open the land to settlement. In *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), the reservation had been both created by statute and allegedly diminished by statute. In our case the 709/744 addition to the Navajo Reservation was neither created nor terminated by congressional action but rather by EO. The statute in question merely acknowledged EOs 709 and 744 and

authorized the President to act in the future. Nonetheless, we assume that congressional intent also governs in a case such as this. Since, in the absence of explicit congressional directive, Executive Branch reservations of land for particular uses take their validity from congressional acquiescence, *United States v. Midwest Oil Co.*, 236 U.S. 459, 469–75, 35 S.Ct. 309, 311–14, 59 L.Ed. 673 (1915), presumably actions undoing former EOs take their validity either from congressional acquiescence or authorization, as was the case here. In any event, Congress did not prohibit the Executive Branch from terminating reservation boundaries until the Act of March 3, 1927, ch. 299, § 4, 44 Stat. 1347 (codified at 25 U.S.C. § 398d). When lands are withdrawn by EO and then restored by an EO authorized by Congress, information about executive intent is relevant to the establishment of congressional intent. In fact, in such circumstances, we believe that executive intent can be inferred to be congressional intent and the formal actions of both branches construed as a whole where there is no evidence suggesting conflicting intent.

report in *Eastern Band of the Cherokee Indians v. United States,* 117 U.S. 288, 300, 6 S.Ct. 718, 722, 29 L.Ed. 880 (1886).

Executive Orders throughout the late nineteenth and early twentieth century invoked restoration language. For instance, in dealing with reservations of land for the Mission Indians in California in the years from 1871–87, Presidents Grant, Hayes, Arthur, and Cleveland reserved various tracts of land, and then frequently restored them to the public domain. At other times they simply cancelled prior EOs. *See* 1 C. Kappler *supra,* at 819–24; *see also* U.S. Dep't of the Interior, *Executive Orders Relating to Indian Reservations* 43–49 (1912) (at least four EOs restored various tracts to the public domain, while at least four EOs cancelled various reservations of land).

Whether "cancelling" and "restoring to the public domain" were synonymous is not ascertainable directly from the face of a given EO but can be gleaned by comparison of various EOs issued by at least three of the Presidents. For instance, under his EO of March 22, 1886, *reprinted in* 1 C. Kappler, *supra,* at 824, President Cleveland "cancelled" a previous EO so far as it related to certain specified lands. Then in his subsequent EO of January 29, 1887, *reprinted in* 1 C. Kappler, *supra,* at 824, he observed that his EO of March 22, 1886 had "restored [those same lands] to the public domain." The phrase "restored to the public domain" never appeared in the earlier Order, thereby suggesting that the terms were synonymous.[24] President Grant's understanding of restoration language in his Mission Indian EOs can be inferred from his use of such language in another context. In an EO of July 2, 1872, *reprinted in* 1 C. Kappler, *supra,* at 916, he "restored to the public domain" part of the Colville Reservation established by EO

of April 9, 1872 and "in lieu" of that land he set apart other land "as a reservation." This language in his July 2nd EO suggests that he viewed restoration language as having disestablished a portion of the reservation and "in lieu" of that portion, he had set aside other lands as a reservation. One can infer that President Harrison shared the same view of restoration language. In his EO of November 19, 1892, *reprinted in* 1 C. Kappler, *supra,* at 877, he clarified the meaning of restoration language by saying that certain lands within the Utah portion of the Navajo Reservation were "restored to the public domain, freed from the reservation made by [an earlier] order."

*Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), supports the view that the terms cancellation and restoration were being used synonymously. *Mattz* interprets the effect of various EOs affecting the Mission Indians by observing that "the *boundaries* of the Mission Reservation were altered repeatedly between 1870 and 1875, and even thereafter.... In its final form, the Mission Reservation consisted of no less than 19 different and noncontiguous tracts." *Id.* at 493–94 n. 15, 93 S.Ct. at 2252 n. 15 (emphasis added). The designated boundary changes between 1870–75 were effected by *restoration* language and after that by both restoration and cancellation language. *See* U.S. Dep't of the Interior, *Executive Orders Relating to Indian Reservations* 43–51 (1912). Yet the *Mattz* Court made no attempt to distinguish between these two methods of diminishment.

More important than the above examples of synonymous use of restoration and cancellation language is the evidence that Presidents Roosevelt and Taft used the terms synonymously too.[25] President

---

**24.** While restoration language could be seen as a subset of cancellation language referring to the title implications of cancellation, this view is less plausible than the view that the terms were synonymous, given the understanding of the time as reflected in the Public Land Commission's report.

**25.** Also, during the same time period, a decision of the Interior Department and its General Land Office, *Crichton v. Shelton,* 33 I.D. 205 (1904) similarly recognized restoration language as language of revocation (cancellation). *Crichton* stated that the lands specified in President Hayes' EO of August 3, 1878 had been "taken out of the reservation and restored to the public domain." *Id.* at 209. The EO itself, however,

Roosevelt, in his EO of January 25, 1904, *reprinted in* 3 C. Kappler, *supra,* at 681 "restored to the public domain" certain lands in Nebraska. Then in his EO of February 20, 1904, *reprinted in* 3 C. Kappler, *supra,* at 681, he modified and amended the earlier EO so as "to permanently reserve [those lands] from entry and settlement and to constitute a part of the Pine Ridge Sioux Indian Reservation in South Dakota." If restoration language dealt only with title and did not affect reservation boundaries, President Roosevelt would have had no need for the amendment establishing that the lands "constitute[d] part of the Pine Ridge Reservation."

In turn, President Taft "restored to the public domain" land reserved to the Papagos under an earlier EO and "in lieu" thereof other land was "withdrawn and reserved," strongly suggesting that one land area was substituted for another as reservation land. Exec. Order No. 1655, (1912), *reprinted in* 3 C. Kappler, *supra* at 673. *See also* Exec. Order No. 1296 (1911), *reprinted in* 3 C. Kappler, *supra,* at 667–68.

Contrary to the district court's opinion, the fact that Presidents Roosevelt and Taft each also used "cancellation" language does not negate the likelihood that similar meaning attached to "restoration" language. True, President Roosevelt in his EO of May 15, 1905, *reprinted in* 3 C. Kappler *supra,* at 690, cancelled an EO written two months earlier and "in lieu thereof" substituted other lands to be added to the Navajo Indian Reservation. Similarly, President Taft in EO 1649 of November 26, 1912, *reprinted in* 3 C. Kappler, *supra,* at 682, 684, used cancellation language to substitute another tract of land for the tract added to the Moapa River Reservation four weeks earlier. As already noted, however, cancellation language is typical language used to substi-

tute one tract of land for another. Although we do not know for certain why cancellation language was not chosen to signal diminishment across all contexts, the absence of cancellation language does not undermine the evidence that restoration language also had the effect of cancelling reservation boundaries.

iii. *Restoration Language in the Context of EOs 709/744, Section Twenty-five, and EOs 1000/1284: Legislative History and Surrounding Circumstances*

With the above historical material as background, we turn now to the specific factual context of EOs 709/744, section twenty-five, and EOs 1000/1284. Circumstances surrounding the issuance of EOs 709/744 establish that the 709/744 area was withdrawn from the public domain in order to allot land to off-reservation Indians needing protection from white encroachment on their water holes and grazing areas. The records of Indian Office correspondence with Indians and whites in New Mexico, with the U.S. Congress, and with the President all evidence that the withdrawal and reservation addition were to be temporary, not temporary in the sense that all reservations of land for the Indians would be temporary, but temporary in a far more specific and time-limited sense. *See, e.g.,* Exs. 13, 14, 15, 16. After issuance of EOs 709/744 the records of the Indian Office, even with a change of administration in 1909, continue to evince a consistent position that the withdrawal was only temporary and for a limited purpose. *See, e.g.,* Exs. 19 at 3, 20 at 7–9, 21 at 2, 23 at 5, 39 at 8, 40 at 7, 49 at 1, 56a at 2, FV at 2, FAB at 2. Rather than opening reservation lands to integration and assimilation, as contemplated by the General Allotment Act, EO 709 was meant to protect off-res-

merely "restored [the specified lands] to the public domain." 1 C. Kappler, *supra,* at 831. Moreover, *Crichton* referred to President Grant's EO of January 31, 1870 as having been "subsequently revoked" by his EO of February 17, 1871. President Grant's 1871 EO merely approved Interior Department language asking for "restoration to the public domain" of the

lands specified in the earlier EO. 1 C. Kappler, *supra,* at 820. While a transmittal letter from the Interior Department indicated that the intent of the 1871 EO was to revoke the prior EO, *id.,* the language approved by the President used only language of restoration and not of revocation. *Id.*

ervation Navajos from competing settlement. EO 709 was issued because the General Allotment Act was not working to protect the Navajos on *public domain* land, and less rather than more interaction was needed to protect their nomadic, grazing needs. Adding 709/744 lands to the Reservation in addition to withdrawing them from settlement was not intended to create a permanent addition of reservation land with tribal jurisdiction over all those lands, in spite of the Tribe's attempts to apply temporary status only to the withdrawal and not to the addition. It strains credulity to accept the view of the Tribe's expert witness, Mark Leutbecker, that Commissioner Leupp was recommending a temporary *withdrawal* for title purposes and a permanent *addition* to the reservation for jurisdictional purposes, R. Vol. III at 397–98, especially when the distinction was not clear or even extant at the time. Furthermore, Leutbecker's view is contradicted by Leupp himself, who, in explaining EO 709, specifically told Territorial Delegate Andrews that "[i]t is not intended that this is to be a permanent *addition*." Ex. 19 at 3 (emphasis added).[26]

The Tribe argues that a temporary extension would have provided only illusory protection to the Navajos living on public domain lands, and urges us not to construe Executive Branch action as providing only illusory protection. We do not read the record as evidence that the extension necessarily provided only illusory protection. Admittedly, knowledgeable persons such as Superintendent Harrison and Father Weber knew that the 160 acres allowed for allotment by the General Allotment Act were

insufficient to provide sufficient range land in desert country. That was why Superintendent Harrison urged that, if an extension could not be created, allotments should be granted in areas where a water supply existed or could be developed; if the Navajos controlled the water supply, then, in effect, they would be able to control more than the 160 acres allotted to them, and other stockmen would not find the area as desirable for their own grazing purposes. The protection offered by EO 709 need not have been ineffective if Harrison's purpose had been realized and if railroad lands in the 709/744 area could have been exchanged for others outside it, but as it turned out, problems developed in the allotting process itself and in consummating land exchanges with the Santa Fe Railroad. *See* section iv, *infra.*

Furthermore, even if the protection of a temporary extension was illusory, the President was well apprised of the temporary purpose of the EO, as evidenced by documentation supporting Secretary Garfield's recommendation, which included correspondence from Commissioner Leupp and Father Weber describing and acknowledging the temporary nature of the EO.[27] Exs. 14, 15, 16. Finally, the position of top Interior Department officials during the 1907–11 time period was consistent in describing the purpose of EO 709 as temporary. *See, e.g.,* Exs. 13, 15, 19 at 3, 39 at 8, 12, FV at 2. The record amply illustrates the political conflict in New Mexico at the time and the lobbying efforts directed to the Indian Office and Interior Department not to extend the reservation at all. *See, e.g.,* Exs. 10,

---

**26.** Additionally, allotments in the 709/744 area were limited to those living in the area and were not extended to those living within the older reservation boundaries. In other words, the withdrawal protected just the public domain Navajos and did not treat the new area as reservation open to any and all Navajos seeking allotment therein. *See, e.g.,* Exs. FV at 2, 24 at 3, 64 at 5. This fact lends support to the argument that the reservation was temporary until its limited purpose of allotting to former off-reservation Indians could be accomplished.

**27.** The Tribe's attempts to make a substantive distinction between Leupp's October 30th draft of his letter to Garfield and his final November

6th letter are not persuasive. The Tribe argues that in the October 30th draft, Leupp stated only that a "temporary withdrawal of the lands" would be necessary, Ex. FD at 2, while in his November 6th draft he wrote that a "temporary withdrawal of the lands ... and their addition to the Navajo reservation" would be necessary, Ex. 15 at 3. The reason we attach no special significance to the addition of the latter phrase in the November 6th letter is because essentially the same phrase appeared twice in the October 30th letter at both a prior and a subsequent place, e.g., "I have prepared ... a draft of an Executive Order adding the lands to the reservation...." Ex. FD at 2–3.

12, 19, 20. Compromise is evident from the outset.

Contrary to the Tribe's assertions, President Roosevelt's EO of November 14, 1901 does not undermine the conclusion that restoration language was synonymous with boundary diminishment. The 1901 EO, *reprinted in* 1 C. Kappler, *supra*, at 877, withdrew land in Arizona from the public domain until Indians residing thereon "shall have settled permanently under the provision of the homestead laws or general allotment act." The Tribe argues that if the Executive Branch intended to set aside 709/744 lands temporarily for allotment purposes, the 1901 EO was a model for doing so. The Tribe's argument, however, fails to consider that withdrawal alone, without creation of a reservation, would have required the Navajos to be allotted under section four of the General Allotment Act. *See* Exs. 41 at 6–7, FAV. Section four did not sufficiently protect the nomadic Navajos in the 709/744 area from competition, for they did not necessarily meet the section four requirement that in order to be allotted lands off the reservation they had to "make settlement" of them. 24 Stat. at 389. Not all of the water holes and potential dam sites that they wanted allotted to them were within the areas in which they had made "settlement." Even the Tribe's expert witness Leutbecker acknowledged this. R. Vol. III at 307–08; *see also* Ex. 41 at 6–7.

An additional burden for off-reservation Indians, to which section four of the General Allotment Act applied, was that they had to apply to the local land office in order to be allotted. General Allotment Act, § 4, 24 Stat. at 389, as amended by 26 Stat. at 795; *see also* Ex. FBQ. In contrast, if the reservation were extended so that the off-reservation Indians could become reservation Indians, then they could be allotted under section one of the Act, which allowed the allotting agents to come to them. § 1, 24 Stat. at 388. Finally, by adding the lands to the reservation rather than merely withdrawing them from sale and settlement, the privately owned railroad lands within the new reservation boundaries could be swapped for lands outside the boundaries under the Act of April 21, 1904, ch. 1402, 33 Stat. 189, 211, something both Navajo Agency Superintendent Harrison and Father Weber had urged. *See* Exs. 7 at 6, 14 at 3. For all these reasons, EO language similar to the 1901 language would not have solved the problem facing the Navajos in the 709/744 area.

The legislative history reflected in official congressional documents, although sparse, clearly supports the view that the extension was to remain only until the Navajos in the 709/744 area had been allotted. First of all, the joint resolution was drafted by Commissioner Leupp, whose pronouncements as to temporariness are consistent and unambiguous. Second, both the House and Senate reports on the restoration resolution incorporated a letter from Acting Commissioner of Indian Affairs Larrabee stating that "a temporary reservation of the lands" was made "until such time as the Indian occupants could be allotted." S.Rep. No. 681, 60th Cong., 1st Sess. 15–16 (1908); H.R.Rep. No. 1663, 60th Cong., 1st Sess. 1–2 (1908). Larrabee reported that the resolution had the approval of the Interior Department, and the Senate and House Committees adopted the recommendation of the Executive Branch as its own, stating that the recommendation authenticated the validity of the resolution authorizing restoration of the affected lands to the public domain. *See* H.R.Rep. No. 1663, *supra*, at 1. The resolution became a proposed amendment to an Indian bill. The Conference Report, reprinted in the Congressional Record, described the amendment thusly: "so soon as all the allotments have been made to the Navajo Indians upon the lands reserved by Executive order *for that purpose* so much of the reserve lands as have not been needed for such allotments shall be restored to the public domain." 42 Cong. Rec. 7050 (1908) (emphasis added). The amendment was adopted as section twenty-five of the Act of May 29, 1908.

In summary, under the rule of *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), where the statutory evidence "suggest[s]" *unchanged* reservation boundaries, the surrounding circum-

stances must unequivocally reveal "a widely held, contemporaneous understanding" that the reservation would shrink. *Id.* at 471, 104 S.Ct. at 1166. Here, given the historic usage of restoration language to terminate boundaries and acceptance of such language by the federal courts as language of termination, the statutory evidence suggests *changed* boundaries. Nonetheless, because the evidence lacks explicit language of termination and merely *suggests* changed boundaries, we have examined the surrounding circumstances. We conclude that the district court erred in failing to differentiate the short-term temporary nature of the 709/744 addition from the expected demise of the reservation system in general. Finding unequivocal evidence of a widely held, contemporaneous understanding that the purpose of 709/744 was temporary and limited, we conclude that the operative restoration language of section twenty-five, combined with its legislative history and the circumstances surrounding its passage, establish that Congress intended to allow the President to terminate the reservation status of the 709/744 area. We further conclude that invocation of operative restoration language in EOs 1000/1284 did, in fact, cancel the 709/744 reservation boundaries in New Mexico.

### iv. *Subsequent Congressional and Executive Action*

According to *Solem v. Bartlett*, subsequent Congressional and Indian Office actions in the decades following EOs 1000/1284 have "some evidentiary value" but less than the events surrounding passage of the statute in question. *See Solem,* 465 U.S. at 471, 104 S.Ct. at 1166. Because the evidence provided by the Act and its legislative history is amplified in this case by subsequent history, we detail it.

Evidence from the Interior Department, the Navajo Tribe, and Congress supports our conclusion that, in the decades follow-

ing EOs 1000/1284, Congress and the Interior Department continued to view the 709/744 area in New Mexico as cancelled reservation. As will be summarized herein, the parties presented volumes of conflicting evidence in support of their own positions with respect to the subsequent actions of the legislative and executive branches. Were subsequent actions the sole measure of congressional intent, we might have some difficulty with certain ambiguities, but the requirement in *Solem* for unequivocal evidence is limited to the period surrounding passage of the statute in question.[28] *Id.* Since we have already concluded that congressional intent was clear at the time of section twenty-five and EOs 1000/1284, the ambiguities in the subsequent history, all of which are resolved or overwhelmed by other subsequent actions, do not undermine our conclusion. As will be seen, the occasional references in Interior Department correspondence, statistical tables, maps, and leases to the New Mexico 709/744 area as reservation or opened reservation pale in the face of consistent official pronouncements that the 709/744 area lacked reservation status. Moreover, the Indian Office was continually pushing for re-reservation status for the 709/744 area and continually being rebuffed by the Interior Secretary and by Congress. In such a context, its paradoxical references to the area as reservation must be heavily discounted as convenient colloquialisms because if it really believed that the area retained its reservation status it would not have labored so repeatedly to regain reservation status for the 709/744 area in New Mexico.

Early confirmation of congressional and executive intent to cancel the New Mexico extension is offered by subsequent EOs dealing with the same land. President Taft in EO 1483, February 17, 1912, refers to EO 1284 as having "eliminated" certain 709 lands from the Navajo Reservation. Exec. Order No. 1483 (1912), *reprinted in* 3 C.

---

**28.** That the *subsequent* evidence need not be completely unambiguous on its face is demonstrated by the weighing of conflicting evidence in such cases as *DeCoteau v. District County*

*Court,* 420 U.S. 425, 442, 95 S.Ct. 1082, 1091, 43 L.Ed.2d 300 (1975), and *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 603, 97 S.Ct. 1361, 1371, 51 L.Ed.2d 660 (1977).

Kappler, *supra,* at 686. The stated purpose of EO 1483 was to "restore[ ] to the status existing before [EO 1284]" various odd-numbered sections owned by the Santa Fe Railroad in order to allow an exchange of lands between the Railroad and the Navajos under the Act of April 21, 1904, ch. 1402, 33 Stat. 189, 211. The Act provided for the exchange of private lands within an Indian reservation for those outside the reservation.[29] As noted in the EO, a land exchange had been "initiated prior to said elimination." Nonetheless, it could not be consummated unless the railroad lands remained within the reservation. In his letter to the President recommending EO 1483 and submitting what became the adopted draft of the EO, Acting Interior Secretary Samuel Adams explained that the exchange had been approved by the Interior Department on April 12, 1909, and that subsequently the railroad company had executed a deed of relinquishment. Ex. 52 at 2–3. Adams stated that prior to the consummation of the exchange, how-ever, EO 1284 "eliminated [the involved townships] from the Navajo Reservation." *Id.* at 3. He then explained that "a question has arisen as to the legal right of this Department to [c]onsummate the proposed exchange, the base lands being now not within an Indian reservation." *Id.* at 4. To dispose of the question, he recommended issuance of EO 1483.

As pointed out by the Tribe, a letter written by Assistant Interior Secretary Frank Pierce in February 1911 took a different view as to whether the consummation could take place without an EO restoring the railroad lands to reservation status. Ex. FCC. The Tribe's invocation of Pierce's position, however, ignores the fact that a year later it was overridden within the Department. The position of the Executive Branch, embodied in the EO, was that in order to complete the exchange the railroad lands involved should first be restored to reservation status.[30] This decision nec-

29. The relevant provision provided:
   "That any private lands over which an Indian reservation has been extended by Executive order, may be exchanged at the discretion of the Secretary of the Interior and at the expense of the owner thereof and under such rules and regulations as may be prescribed by the Secretary of the Interior, for vacant, non-mineral, nontimbered, surveyed public lands of equal area and value and situated in the same State or Territory."
   33 Stat. at 211.

30. Pierce's position was that since the land in question had been allotted to the Navajos before EO 1284, those lands could be seen as having reservation status. (It was not a position that *unallotted* lands retained reservation status.) As noted, his position was later overridden, primarily on the basis that to avoid any question as to the legality of the exchange it was better to assume that the land in question was no longer within a reservation. *See* Ex. 52 at 5.

In 1916, Commissioner of Indian Affairs Cato Sells urged a position similar to that of Pierce's several years earlier. He learned that exchanges of some 226 additional allotments to Navajos of railroad sections in the 709/744 area had not been consummated prior to EOs 1000/1284, and he posited that, as allotted lands, they could be considered reservation for purposes of completing the exchange. *See* Exs. 59 at 4, FBE. The Interior Department again rejected this position. Ex. 59 at 7–8. To effectuate the desired exchange, the Department instead drafted EO 2513 returning the affected lands to reservation status. President Wilson signed the order on January 15, 1917. *See* Exec. Order No. 2513 (1917), *reprinted in* 4 C. Kappler, *Indian Affairs: Laws and Treaties* 1030–31 (1929). In urging its issuance, Interior Secretary F. K. Lane noted that an earlier "temporary rewithdrawal" had been needed to accomplish a similar exchange (a reference to EO 1483) and urged parallel action to make possible another exchange with the railroad under the Act of 1904. Ex. 62 at 2–3. In other words, like EO 1483 before it, EO 2513 reflected the Department's position that certain allotments to Indians made between 1908–11, i.e., after EO 709 and before EO 1284, could not become a basis for a swap under the Act of 1904 because the affected lands were no longer within a reservation.

Five years later Congress demonstrated that it shared the Interior Department's understanding of the status of such allotments on railroad sections. In passing the Act of March 3, 1921, ch. 119, § 13, 41 Stat. 1225, 1239, Congress authorized the United States to accept reconveyances of railroad and other privately owned lands within the 709/744 area in order to consolidate lands for the Navajo Tribe. Such a statute would not have been necessary had the land retained reservation status. *See also* R. Vol. III at 330–35. As Special Commissioner to the Navajo Tribe Herbert J. Hagerman explained in a special report to Congress many years later,

   "In 1921 was passed another exchange law to take care of the railroad odd-sections, outside

essarily implicates not just a conscious decision with respect to title but also with respect to jurisdiction, since title was held by the railroad company regardless of whether the land was within or without the reservation. Placing the land within reservation *boundaries* was what was required to consummate land exchanges under the Act of April 21, 1904.[31]

Another EO, No. 1482, issued along with EO 1483 on February 17, 1912, supports the position that the 709/744 reservation status had been terminated by EOs 1000/1284. In EO 1482, President Taft, upon recommendation of both the Secretary of Agriculture and Acting Interior Secretary Adams, Ex. 51, modified the boundaries of the Zuni National Forest by excluding portions of the Navajo Indian Reservation previously included therein, with the exception of the Reservation lands described in EO 1284. *See* Exec. Order No. 1482 (1912), *reprinted in* 3 C. Kappler *supra*, at 670. An earlier proclamation by President Taft on March 2, 1909, 35 Stat. 2242, had placed various Zuni and Navajo Indian reservation lands into the Zuni National Forest, among them certain sections within Township 15 North, ranges 13 and 14 west, New Mexico Prime Meridian, which were, at the time, within the 709/744 extension to the Navajo Reservation. Ap-

parently there was some question as to the legality of this proclamation, *see* Ex. 51. The purpose of EO 1482, as described therein, was to undo the proclamation for the most part, i.e.,

"to restore in all respects the Zuni Indian Reservation and that part of the Navajo Reservation not affected by Executive order No. 1284 of January 16, 1911, to the status existing prior to the said proclamation of March 2, 1909, as though the inclusion of the lands within the Zuni National Forest had not been ordered, and said Indian reservations are hereby fully recreated and restored to that status, with the exception above mentioned."

Exec. Order No. 1482, *supra*. In other words, although other Navajo lands were removed from the National Forest and returned to reservation status, the sections already restored to the public domain by EO 1284 were to be retained as National Forest lands. The clear inference in the EO and in Acting Interior Secretary Adams' recommendation of February 16, 1912 is that because the reservation status of the affected 709/744 lands had been terminated by EO 1284, those lands could be retained in the National Forest. *See* Ex. 51.[32] Acting Secretary Adams took a sim-

---

the boundaries of the then-existing reservation in the same way that the law passed on April 21, 1904, took care of the consolidations and exchanges within all of the extensions to the reservation. Had the 1907 [EO 709] extension not been annulled, the 1904 law would have permitted the necessary consolidations and exchanges in the eastern Navajo area; but with the nullification of the 1907 extension, it was manifestly necessary to provide the means of securing these lands otherwise."

S.Doc. No. 64, 72d Cong., 1st Sess. 31 (1932).

**31.** Shortly after issuance of EO 2513, *see* note 30, *supra,* the railroad announced that it was unwilling to exchange the isolated tracts described in the EO but "would be willing to relinquish its entire holdings" in the townships involved. Ex. 65 at 7. Therefore, the Interior Department prepared yet another EO that would have withdrawn twenty-two townships within the 709/744 area and parts of eleven other townships, together comprising some 582,-000 acres. *See id.* at 9–10. The withdrawal was never accomplished because the U.S. Congress

passed a statute prohibiting the extension of reservations in New Mexico and Arizona by Executive Order. 25 U.S.C. § 211 (enacted May 25, 1918). The statute was interpreted by Superintendent Stacher, Father Weber, and others as a political response by the Congress to attempts by the Indian Office to restore about a third of the 709/744 area to reservation status. *See, e.g.,* Exs. FGF, 70.

**32.** The Tribe argues that language in President Woodrow Wilson's subsequent Proclamation of November 30, 1917 is evidence that the reservation status of the 709/744 lands had not been terminated by EOs 1000/1284. In adding certain sections within Township 15 North, ranges 13 and 14 west, New Mexico Prime Meridian, to the Manzano National Forest (formerly Zuni National Forest lands), the Proclamation "vacate[d]" EOs 709/744 as they related to those particular sections. Proclamation No. 1412, at 1 (1917), *reprinted in* 4 C. Kappler, *supra*, at 984.

For two reasons we do not give much weight to the Tribe's interpretation of this language. First, we note that the Manzano proclamation of

ilar position as to the terminated reservation status of 709/744 lands in his letter of April 30, 1912 to New Mexico Congressman H.B. Ferguson, in which he referred to allotments within the 709/744 area as falling "outside of the boundaries of existing Navajo Reservation in New Mexico." Ex. 53 at 4.

Additional EOs in the first year or so following EO 1284, and Interior Department correspondence accompanying them, infer that the 709/744 reservation had been terminated. For instance, in EO 1359, issued May 24, 1911, several sections or partial sections within townships that had been restored to the public domain under EO 1284 were *"reserved* from entry, sale or other disposition, for Indian purposes." Exec. Order No. 1359 (1911) (emphasis added), *reprinted in* 3 C. Kappler *supra* at 686. The lands described were set aside for administrative purposes in connection with the Navajo Indian Schools. Ex. 53 at 4; *see also* Ex. FBZ.[33] Included among them was land for the Pueblo Bonito Agency headquarters at Crownpoint, New Mexico. Use of the term "reserved" rather than "withdrawn" seems to indicate that *no* reservation for Indian purposes had remained under the former restoration language and, therefore, the land had to be re-reserved, as it were. Many years later Superintendent Stacher seems to confirm this interpretation in noting that after the restoration EOs, his Agency headquarters and Boarding School were located on two

sections of land that had been reserved by EO but that were not located on the "reservation proper." Ex. 86 at 1.

Similarly, EO 1700, February 10, 1913, set apart a section of land containing an Indian dam within the 709/744 area "as a reservation for use of the Navajo Indians in common." Exec. Order No. 1700 (1913), *reprinted in* 3 C. Kappler, *supra* at 688. Again, arguably, if 709/744 lands retained reservation status, EO 1700 would not have been necessary; the land that had been opened to settlement could simply have been "withdrawn" from settlement but need not have been "reserved."

Yet another EO, No. 1774, signed by Woodrow Wilson on May 6, 1913, three months after EO 1700, "reserved" and "set aside for use of Navajo Indians living in the vicinity of Crownpoint, New Mexico" a section within the 709/744 area seen as desirable for the development of an artesian well. Exec. Order No. 1774 (1913), *reprinted in* 3 C. Kappler, *supra,* at 688. The Interior Department letter recommending the EO refers to the section as located within "that part of the *former* Navajo Reservation in New Mexico restored to the public domain by Executive Order No. 1284." Ex. 55 at 2 (emphasis added). If the Reservation was a "former" one, then all attributes of reservation status, including jurisdiction, had been lost.

The correspondence of Superintendent Stacher of the Pueblo Bonito Agency pro-

November 30, 1917 followed within a month the Interior Department's position that railroad lands within the 709/744 area were no longer within a reservation, supporting P & M's counter-argument that the proclamation was not prepared in the Interior Department and did not represent the view of the cabinet-level department with the best historic understanding of the area. Even the Tribe's expert witness conceded that the proclamation was probably prepared by the Agriculture Department. *See* R. Vol. III at 440.

Moreover, it appears that after EO 1482 was issued, the Agriculture Department became concerned as to whether some of the 709/744 sections supposedly retained in the National Forest might have been allotted to Navajos while the lands were in reservation status, thus raising a question as to jurisdictional conflicts between the Agriculture and Interior departments over administration of lands within the forest pre-

serve. Second Assistant Commissioner of Indian Affairs C.F. Hauke wrote to the Secretary of Agriculture in 1913 with respect to these lands, telling him that with the exception of one allotment, Indian Office jurisdiction over the lands had been "relinquished" under EOs 1000/1284 and that the Indian Office had no objection to their being included in the Zuni National Forest. Ex. 56a at 2. Hauke's letter supports P & M's interpretation that reservation status of the lands in question had been terminated by EOs 1000 and 1284. Notably, the Manzano Proclamation did not include the allotted section identified by Hauke. *Cf.* Exs. FDY, 56a.

**33.** Exhibit FBZ documents that the General Land Office approved a temporary withdrawal of some of these lands while the Interior Department awaited full information from Superintendent Stacher as to the exact lands required for permanent withdrawal.

vides further evidence that the 709/744 extension in New Mexico had been terminated by EOs 1000/1284. The Agency had responsibility for New Mexico Navajos living in the 709/744 area and east of the original reservation, which also took in an area north of the 709/744 area. (See map in Appendix.) After EOs 1000/1284, the Agency continued to exercise administrative responsibilities over Navajos in the area. In his letter of April 25, 1911 to the Superintendent of Indian Schools in Flagstaff, Arizona, discussing the plight of the Indians in his Pueblo Bonito region, Stacher first reiterates a telegram of the same date as stating "No Indian reservation here. Surplus lands restored public domain." Ex. 49 at 1. In the same letter, he states *"there being no reservation,* wells or reservoirs should be placed on some of the allotments or Government sections reserved for this purpose, and, to control the range, the Indians should have leased the railroad sections." *Id.* at 3 (emphasis added).

Chee Dodge, an important Navajo leader and spokesman at the time, also believed that the 709/744 in New Mexico was terminated reservation. He wrote to Interior Secretary F.K. Lane on January 18, 1917, reviewing the history of the 709/744 area and complaining about renewed encroachments by absentee stockmen, which were having the effect of confining the Navajos to their allotments.[34] The Dodge letter referred four times to the lands under the Pueblo Bonito Agency in New Mexico as "this former extension" and requested "the maint[e]nance of our means of making a living by extending the protection of a reservation over the lands of the Pueblo Bonito Agency ... and securing the ownership of the railroad lands...." Ex. 63 at 2–4. The request addresses reservation status as well as title interests. It seems unlikely that Dodge would have requested extension of the reservation had he thought that

the 709/744 lands in New Mexico retained reservation status.

During this same time period, Interior Secretary Lane asked Commissioner of Indian Affairs Sells to provide him with data about all Navajo Reservation additions. Sells' response of February 13, 1917 listed the 709/744 EOs and indicated that, as of that date, the reservation created by EOs 709/744 comprised only 1,036,800 acres. Ex. 64 at 2. This acreage corresponded with the acreage remaining in the Arizona portion of the 709/744 addition. R.Vol. VIII at 1357. The original acreage prior to EOs 1000/1284 had been more than 2.8 million acres, of which approximately 1.8 million was again in the public domain or had been allotted. Sells stated that the table in which the one million acres was listed

"shows the reservation as it exists today. Executive Order of January 15, 1917 [EO 2513] withdrew some 75,000 acres on odd numbered sections,—railroad lands,—largely in noncontinuous tracts, but this area was omitted from the table above as it does not lie adjacent to or form a part of the reservation proper."

Ex. 64 at 2. The referenced railroad lands were within the 709/744 area. If the Indian Affairs Office believed that the 709/744 lands had retained reservation status after they were restored, Sells would not have stated explicitly that the railroad lands did not lie adjacent to the reservation or form part of the reservation proper.

Five years later, the Board of Indian Commissioners, in its 1922 report to the Interior Secretary, reported as follows on the "Pueblo Bonito Agency, New Mexico[:]"

"The 2800 Navajos under this jurisdiction are all nonreservation Indians.... [N]early all of the townships involved in the problem of the nonreservation Indians ... are within this jurisdiction. This area includes over a hundred townships lying north of the Santa Fe Railroad,

---

**34.** Both Superintendent Stacher and the Navajos well understood that the Navajo allotments were insufficient to protect their nomadic lifestyle. Exs. 43, 63. In fact, in trying to prevent the 1911 restoration of the remaining 709/744

lands in New Mexico, Stacher had previously told the Commissioner of Indian Affairs that the allotments were "practically worthless if the Indians cannot control the range adjoining them." Ex. 43 at 2 (emphasis omitted).

east and south of the Navajo Reservation, and the country is adaptable only for rough grazing."

U.S. Dep't of the Interior, *Fifty–Third Annual Report of the Board of Indian Commissioners* 12–13 (1922). This area in which "all nonreservation Indians" were said to live included the New Mexico 709/744 area plus twenty-two or more additional townships.

Over the years, Superintendent Stacher pressed for an extension to the Navajo Reservation to protect various groups of public domain Navajos over whom he had jurisdiction. With Special Commissioner to the Navajo Tribe H.J. Hagerman, and Chief of the Land Division of the Indian Office W.A. Marshalk, he drafted a 1923 memorandum referring to the fact that the lands sought for the extension had been withdrawn by an earlier EO "now cancelled." Ex. 76 at 5. The proposed extension would have taken in most of the lands restored by EO 1284, plus others just north of the Santa Fe Railroad line in western New Mexico. *See* Ex. 77 at 5. Although a congressional bill was prepared, the proposal was killed by opposition from within New Mexico. *See* Sen.Doc. No. 64, 72nd Cong., 1st Sess. 35–36 (1932).

In 1931 Stacher was still Superintendent of the Pueblo Bonito Agency. At congressional hearings held that year at the Agency headquarters in Crownpoint, New Mexico, he testified with respect to the conditions of Navajos under his jurisdiction and offered the following history:

"[I]n 1907 an Executive order extended the reservation, covering a part of this Indian country. All Government land at that time within the area was withdrawn from entry until such a time that these Indians could be allotted....

The allotment work was never fully completed and nearly half of the Indians failed to secure allotments at that time. Pressure was brought upon the department from various angles to expedite the restoring of this extension to the public domain. We urged that no such move be made but to keep it a reservation while there was a chance to do so, but this could not be done and in 1911 the allotting crews were disbanded, and this work has never been completed.

Later we urged the Indian Bureau to try to secure the Executive order reservation of this same area while Hon. Franklin K. Lane was Secretary of the Interior as he was favorable to the proposition, but when the people of New Mexico learned of what was about to be done, many telegrams, protesting the extension, were sent, and the result was that Congress relieved the President of the United States of his power to make Executive order reservations in the future."

*Survey of Conditions of the Indians in the United States: Hearings Before the Subcomm. of the Comm. on Indian Affairs, United States Senate,* 71st Cong., 3d Sess. 9625 (1932); *see also* Ex. FGE at 2.

Final attempts were made during the 1930s to include within the Navajo Reservation all areas in which significant numbers of Navajos lived in Arizona, Utah, and New Mexico. The so-called boundary extension bills for Utah and Arizona were enacted. *See Survey of Conditions of the Indians in the United States: Hearings Before a Subcomm. of the Comm. on Indian Affairs, United States Senate,* 75th Cong., 1st Sess. 18120–21 (1937); *see also* Act of March 1, 1933, ch. 160, 47 Stat. 1418; Act of June 14, 1934, ch. 521, 48 Stat. 960. The New Mexico bill was not passed, although numerous attempts were made between 1933–38. *See* R.Vol. VIII at 1403.

The area to be included within the New Mexico portion of the proposed reservation extension shifted somewhat from bill to bill, as attempts were made to gain the unanimous support of the New Mexico Congressional delegation, but the record indicates that all the versions included the western portion of the New Mexico 709/744 area. The boundary bills were attempting to block certain lands for use of the Navajos close to their EO 1880 reservation lands and to establish a definite limit to the exterior boundaries of the Navajo Reservation. In support of the 1934 House bill, the House Report of the Committee on Indian Affairs, incorporating the position

of Interior Secretary Harold Ickes, stated: "This proposed boundary extension represents the ultimate line to which the Indians can hope to expand their reservation. This fact is realized by the Indians themselves as evidenced at their [last] tribal council." H.R.Rep. No. 1451, 73d Cong., 2d Sess. 2 (1934). The Senate Report accompanying S. 2213 in 1935 was similar. *See* S.Rep. No. 436, 74th Cong., 1st Sess. 2 (1935).

The Interior Department reintroduced the bill in successive years, explaining that only approximately 340,000 acres of public domain land were involved in the western portion (limited version) of the extension. *See e.g., id.;* H.R.Rep. No. 1451, *supra,* at 2. The remainder of the land within the limited proposed extension was "largely within areas consolidated or purchased for the Indians ..., or else embraces an area heavily allotted to individual Indians." S.Rep. No. 436, *supra,* at 2. The Department was trying to reassure Congress that large amounts of public domain land were not involved in the proposed extension, and that title to most of the lands proposed for reservation status was already held by the United States for the benefit of the Tribe or held in trust for individual Indians. In other words, much of the land was already Indian country although not within the borders of the Reservation. In return for congressional approval of the reservation of this checkerboarded land, the Navajos, according to Secretary Ickes, were "willing to legislate away [all their remaining off-reservation] allotment and homestead rights" in the New Mexico counties affected by the proposed legislation. Ex. FGP at 3; *see also* Ex. FGT at 2.

In 1935, the then Commissioner of Indian Affairs, John Collier, testified before the Senate Subcommittee on Indian Affairs in support of the New Mexico boundary bill, describing the history of the area as follows:

"Mr. Collier. In the year 1907 Theodore Roosevelt created it as their reservation including the area within this proposed boundary, and not only that but a much wider area to the north of this.

Senator Frazier. By Executive order?

Mr. Collier. By Executive order. Then, by influences which were brought to bear, that Executive order was canceled, thus creating a situation of a 'no man's land.' "

*Survey of Conditions of the Indians in the United States: Hearings Before a Subcomm. of the Comm. on Indian Affairs, United States Senate,* 75th Cong., 1st Sess. 17440 (1937).[35]

The Director of Lands for the Indian Office, James M. Stewart, testified at the same hearing with respect to the existing boundaries of the Navajo Reservation in New Mexico. He stated that the east boundary followed the range line running between ranges 13 and 14, west of the principal meridian in New Mexico, and the south boundary was approximately on the township line between townships 16 and 17 north. *See id.* at 17659. These boundaries mark the eastern and southern edge of the 1880 EO and exclude all of the 709/744 area.

Despite various modifications in the proposed boundaries and attempts at compromise, the Interior Department apparently could not obtain the unanimous consent of the New Mexico Congressional delegation. *See id.* at 17524. The requirement of unanimous consent for passage of what was considered local legislation frustrated passage of the bill. Nowhere in the hearing excerpts in the record is there one iota of evidence that any member of the New Mexico delegation opposed the bills because he thought the reservation boundaries were larger than what was being proposed and should not be diminished by legislation. None of the bills ever became law.

The Tribe's characterization of these bills as solely "title-related" initiatives ignores the fact that boundaries were explicitly discussed. Although at this period of time

---

**35.** Previously, Superintendent Stacher, in his 1934 Annual Report, had expressed the hope that the New Mexico boundary bill would pass soon, as he said that "[u]pon the Public Domain we have one of the most complex situations found anywhere in the United States." Ex. 86 at 5.

the underlying interests thought to be at stake continued to be title-related, title was intimately linked with boundaries throughout the political controversy over the bills. The Interior Department officials quoted above argued that the only way to secure the area for successful Indian grazing (and efficient federal management of the range) was by expanding the reservation *boundaries* since Indian attempts to purchase 709/744 lands and convince the railroad to swap its 709/744 lands for others had been only partially successful. Permanent withdrawal of the area by EO had not been an option ever since congressional enactment in 1918 of the law prohibiting boundary expansion in New Mexico and Arizona by EO. 25 U.S.C. § 211.

The Tribe's attempts to document ambiguity in the record subsequent to EOs 1000/1284 do not undermine the consistent and clear interpretation of the Interior Department that the reservation had terminated. The Tribe points to several letters from the Indian Office to persons in New Mexico referring to the extension in the present tense (e.g., "that part of San Juan County within what *is* known as the 'Navajo *Extension*' in New Mexico, lying east of the first guide meridian, was restored to the public domain," Ex. FAE at 1 (emphasis added)). *See also* Exs. 41, 45, 46, 47, FAI at 1, FAL–1.[36] In the context of the many explicit statements that the reservation no longer existed, made in the context of management or policy decisions specifically addressing land status, these continuing references to the "extension" rather than the "former extension" are readily seen as colloquialisms, convenient ways to designate a geographic area in easily recognizable form. Use of the term "extension" is always incidental to the point being made and is itself not the focus of any precise inquiry.[37]

**36.** Sometimes Superintendent Stacher referred to the Pueblo Bonito as "reservation." For instance, in 1912 Stacher gave permission to one Dan Pipkin, Esq. to "purchase fat cattle from Navaho Indians living on the Indian Reservation under the jurisdiction of this agency...." Ex. FCN. In correspondence with Second Assistant Commissioner of Indian Affairs C.F. Hauke in 1912, both Stacher and Hauke referred to the allotments to Indians "on the reservation." *See, e.g.,* Ex. FCQ. The reference was secondary to Hauke's request for descriptions of missing allotments in the 709/744 area. A number of years later, in Stacher's letter of October 16, 1920 to the Commissioner of Indian Affairs, he referred to the stock of the Indians "on this reservation." Ex. FEP. These "reservation" references appear to be convenient shorthand references to his Agency's jurisdiction because whenever an official query as to land status arose, Stacher was always careful to explain that most of his jurisdiction was over public domain Indians, and he made repeated attempts (already documented) to extend reservation status over New Mexico 709/744 lands.

In a similar vein, E.B. Meritt, for many years the Assistant Commissioner of Indian Affairs, referred on a number of occasions to the area within Superintendent Stacher's jurisdiction as a "reservation," sometimes in response to the same characterization by Stacher. *See, e.g.,* Exs. FDK, FEU, FEX, FFM, FFO. It is not clear, however, that Meritt was making any distinction between his use of the terms "reservation" and "Indian country," and Stacher's jurisdiction included a lot of Indian country, as the term was then understood, i.e., area where Indians held title to land, either communally or as

allotment in severalty under trust. *See Bates v. Clark,* 95 U.S. (2 Otto) 204, 24 L.Ed. 471 (1877); Exs. FDK at 1, FDH. (In 1948 the Indian country definition was statutorily clarified, and the term "reservation" was distinguished from Indian allotments to which Indian title had not been extinguished. *Compare* 18 U.S.C. § 1151(a) and (c) (June 25, 1948).) In the formal context of congressional testimony in 1920, Meritt described the Pueblo Bonito country as "formerly within the reservation...." *The Indian Appropriation Bill, 1922: Hearings Before a Subcomm. of the Comm. on Appropriations, House of Representatives,* 66th Cong., 3d Sess., 160 (1921). In 1925 congressional testimony, however, he described the Pueblo Bonito lands in New Mexico as one of the "divisions of the Navajo Reservation." *The Interior Department Appropriation Bill, 1927: Hearing Before a Subcomm. of the Comm. on Appropriations, House of Representatives,* 69th Cong., 1st Sess., 421 (1926). We do not place much stock in these differing references, although we note that, after 1923, the Pueblo Bonito Agency included the southern portion of the Navajo Reservation set aside by the EO of 1880, so after that time it included at least 345,000 acres which clearly retained reservation status. *See* Ex. 86 at 9.

Even the Tribe does not attempt to make much of these casual "reservation" references, placing its emphasis instead on the arguments addressed in the body of this opinion.

**37.** We note that it would have been incorrect to refer to the entire 709/744 area as "former extension" because only lands in New Mexico had been restored to the public domain and the

Other attempts to demonstrate ambiguity by the introduction of Indian Office maps from annual reports in the years from 1911 through 1917 and again in 1925 and 1927 are similarly unpersuasive. For the years between 1911 and 1917, reservation maps attached to the annual reports of the Commissioner of Indian Affairs show the EO 1284 portion of the 709/744 area as "opened." The designation as "opened" creates ambiguity as to whether the mapmaker saw the area as a reservation opened to settlement but still reservation or as a reservation that was opened and extinguished.[38] The maps of the Pueblo Bonito area during these years do not include the eastern portion of the 709/744 area (the EO 1000 area) within reservation boundaries. *See, e.g.,* Exs. FDB, FDE, FDN,[39] FDU, FDZ. Moreover, in 1919, 1920, and 1923, the maps in the annual reports show the 709/744 area in New Mexico as "former Indian reservation." In other words, the maps between 1911–17 are not only inaccurate in their designations[40] but later ones are inconsistent with them, reducing the reliability of the maps as sources of data.[41] Given the uniform view of various Commissioners of the Indian Office and Secretaries of the Interior Department that a new extension to the Reservation was needed within the 709/744 area to

protect Navajo grazing rights, any latent ambiguity must be resolved in favor of the position that restoration of the New Mexico portion of the 709/744 area had not only opened it to settlement but terminated it as a reservation.

The same interpretation applies with respect to the designation of "Pueblo Bonito" under the printed category "states and reservations" in annual reports issued by the Indian Office in the decade after EOs 1000/1284. That Pueblo Bonito was listed under the state of New Mexico in a category marked "states and reservations" is not an official pronouncement on land status when authoritative statements from the Indian Office make explicit that the 709/744 had lost reservation status. The Indian Office maintained jurisdiction over Navajos living in the 709/744 area and kept statistics on them. The Pueblo Bonito Agency remained after restoration of unallotted lands to the public domain, and Superintendent Stacher continued to have supervisory responsibilities over the several thousand Indian allottees within his jurisdiction. It is reasonable to suppose that for comparative reporting purposes the statistics on Pueblo Bonito Indians best fit into the charts under the existing designation of reservation.[42] Even Superintendent Stach-

Arizona portion of the extension remained reservation.

**38.** Both the Rosebud Sioux and the Sisseton (also known as Lake Traverse) reservations are shown on the same maps as "opened," yet the Supreme Court declared both reservations to have been extinguished. *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *DeCoteau v. Dist. County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

**39.** Ex. FDN represents that two maps were included in the 1915 Annual Report, one of which includes the eastern portion and the other of which omits it.

**40.** Errors appear in the 1925 and 1927 maps as well. Although the 1925 map includes the EO 1000 portion of the 709/744 area, it fails to include the southern portion of the 1880 EO reservation within the Pueblo Bonito jurisdiction, Ex. FFP, even though that portion had been added to the Pueblo Bonito jurisdiction in 1923. And although the 1927 map correctly shows the EO 1880 lands as part of the "Eastern Navajo" reservation (new name for the Pueblo

Bonito Agency effective January 1, 1927), it incorrectly includes the 1880 lands as within "reservation opened or allotted." Ex. FFY.

**41.** In referring to similarly inconsistent maps, letters, and memoranda, the Supreme Court stated in *DeCoteau v. District County Court,* 420 U.S. 425, 443 n. 27, 95 S.Ct. 1082, 1092 n. 27 (1975), "No consistent pattern emerges. The authors of these documents appear to have put no particular significance on their choice of a label." The same conclusion applies here.

**42.** Interpretation of the statistical tables in the annual reports is complicated by the fact that the accompanying maps designate the 709/744 area in *Arizona* as Pueblo Bonito reservation. Yet the record on appeal does not definitively establish whether Stacher's Pueblo Bonito jurisdiction was limited to Navajos living in New Mexico or extended to the 709/744 area in Arizona. If Stacher's Agency had jurisdiction over the Arizona 709/744 reservation, then this would help to explain the references to the Pueblo Bonito area as reservation. Stacher's 1934 Annual Report described the history of his

er's 1934 annual report lists his Agency under the category marked *Reservation,* see Ex. 86 at 7, although other sections of the same report make explicit that only a portion of his territory was actually located within the Navajo Reservation, *see id.* at 9, 11.

We are similarly unpersuaded by the Tribe's evidence that on a number of oil and gas leases the term Pueblo Bonito had been written into the space preceding the printed word "reservation" on those leases. The lease forms were standard printed forms dealing with leases on allotted lands, and use of the term "reservation" was a convenient designation for the allotted lands being leased in the 709/744 area and a means of identifying the Indian Agency responsible for recommending approval of the lease arrangement. Given the fact that Superintendent Stacher sometimes referred to his Agency's jurisdiction as reservation, see note 36 *supra,* it follows that he would not see a need to modify the lease form.

Contrary to the Tribe's position, congressional appropriations for water development on the Pueblo Bonito "Reservation" or "subdivision of the Navajo Reservation" in the years from 1919 to 1927 do not show that Congress recognized the 709/744 area

in New Mexico as maintaining reservation status. Congress was appropriating much needed money for water development throughout the entire Navajo area in which the Indian Office maintained jurisdiction, and was appropriating one lump sum of money that could be used anywhere within the five subdivisions identified.[43] Even if the 709/744 area in New Mexico may have been included in the references to the Pueblo Bonito "Reservation," the fact remains that (1) the 709/744 reservation in Arizona was also being designated in tables and maps in Indian Office annual reports as Pueblo Bonito Reservation until 1927, (2) the Agency had jurisdiction over Indians living on parcels of land within the New Mexico 709/744 area that had been re-reserved under EOs subsequent to EOs 1000/1284, and (3) after October 23, 1923, the southern portion of the EO 1880 Reservation was placed under the Pueblo Bonito Agency, Ex. FCC, so a significant portion of New Mexico land under the Pueblo Bonito Agency was unarguably reservation land when the appropriation acts of 1924–27 were passed.

If subsequent treatment of the 709/744 area by all officials within the Executive Branch had to be unequivocal, the facial ambiguity in certain tables, maps, leases,

Agency and stated that at its creation in April, 1909, his jurisdiction was over "all the Navajos living upon the Public Domain in Arizona and New Mexico." Ex. 86 at 1. Yet the January 1909 Interior Department letter establishing the superintendent's position and salary stated that the jurisdiction was "over all of the Navajo Indians allotted or living on *public lands in New Mexico,* east of the original Navajo Reservation; also those on the *Eastern Navajo extension* established by Executive Order of November 9, 1907 [No. 709], and amended by Executive Order of January 17, 1908, No. 744." Ex. FAC at 1 (emphasis added). This statement indicates that Stacher did not have jurisdiction over public domain Indians in Arizona, yet it may imply that the jurisdiction did extend to the Arizona 709/744 extension if the phrase "Eastern Navajo extension" refers to the entire 709/744 area. Perhaps this is what Stacher meant to say in his 1934 statement. On the other hand, perhaps the reference in the letter to the "Eastern Navajo extension" was a reference just to the New Mexico portion of the extension. Adding to the ambiguity, a 1922 Stacher letter states that the Roster of the Indian Service describes his jurisdiction as including those "on Navaho Exten-

sion." Ex. FEV at 1. The term "eastern" was omitted, perhaps suggesting that his jurisdiction extended over the entire Arizona–New Mexico extension area. In any event, it seems clear that Stacher, Father Weber, Chee Dodge, and the Indian Office concentrated their attention on the New Mexico portion, because the political situation in the checkerboard area there created so many problems for the Navajos living thereon. Nonetheless, the Arizona portion was referred to as Pueblo Bonito reservation in annual reports up until 1927, by which time a realignment of the San Juan, Navajo, and Pueblo Bonito jurisdictions into the Northern, Southern, and Eastern Navajo jurisdictions was being acknowledged by the mapmakers. *Cf.* Exs. FFP, FFY. In summary, we are unable, on the basis of the record before us, to ascertain whether Stacher's jurisdiction ever extended to the Arizona 709/744 lands.

43. In 1919, 1920, and 1922, the appropriation was given to the Navajo, Moqui, "Pueblo, Bonito, San Juan, and Western Navajo" reservations, as if the Pueblo and Bonito were separate areas. In other years, the incorrect comma between the terms was removed. *See* Exs. FFQ, FFR.

and correspondence might be more troublesome, but minor facial inconsistencies within the Executive Branch in the years after the issuance of EOs 1000/1284 do not negate lack of ambiguity at the time the 709/744 extension was created and restored, nor do they override the clear Interior Department position that the lands lacked reservation status. Furthermore, any possible congressional ambiguity in its appropriation acts for the Pueblo Bonito subdivision of the Navajo Reservation is overcome by congressional refusal on multiple occasions to allow any extension of the Navajo Reservation into the 709/744 area in New Mexico either by Executive Order or by statute in the decades following EOs 1000/1284.

The argument of the Tribe that the primary focus of all the maneuvering was on title and land exchange to procure sufficient grazing land for the Navajos is beside the point. The Tribe concedes that the Indian Office and Congress were not distinguishing clearly between title and jurisdiction in the legal sense that we do now. What it overlooks, however, is that concentration on title did not result in absence of intent with respect to boundaries. If intent can be shown to encompass *both* title and boundary matters, the fact that the primary problem was a title problem is irrelevant. Congressional, Interior Department, and Navajo attention to boundary issues in the decades following EOs 1000/1284 boundary was absolutely explicit.

### v. Summary

In the context of the legislative history and surrounding circumstances, we conclude that the phrase "restore to the public domain," as used in section twenty-five of the Act of May 29, 1908 and in EOs 1000/1284 was widely understood to diminish or terminate the 709/744 boundaries. The district court's interpretation that the concern was with title transfers misses the mark by ignoring explicit evidence that the boundaries were considered to have been terminated. Together, the restoration language and legislative history reveal substantial and compelling evidence that, although the primary focus of the federal

government was on title interests, the operative phrase "restore to the public domain" in section twenty-five and EOs 1000/1284 encompassed the extinguishment of the New Mexico 709/744 boundaries. Furthermore, the circumstances surrounding section twenty-five and EOs 1000/1284 reveal unequivocal evidence of a widely held contemporaneous understanding that the reservation would shrink as a result of the restoration of unallotted lands to the public domain. The subsequent history of congressional and Interior Department action reinforces this view. Ambiguous references to reservation lands in the area within the jurisdiction of the Pueblo Bonito Agency do not negate the fact that the Indian Office attempted on numerous occasions to re-expand the reservation into the New Mexico 709/744 area, only to be rejected each time by Congress.

### C. Subsequent Demographics.

Having concluded that Congress evinced a clear intent to allow the 709/744 reservation in New Mexico to be diminished or terminated and that, in fact, it was diminished or terminated by EOs 1000/1284, actions which the New Mexico territorial delegate promoted, we need not linger over the subsequent demographics of the area. No one is disputing the fact that the area has remained predominantly Navajo in character throughout the entire century. Some fifty-five percent of the land surface is presently either in Navajo fee ownership or held in trust for the Tribe or individual Navajos in severalty. An additional twenty-one percent is federal land controlled by the Bureau of Land Management (formerly the General Land Office) and leased to the Navajo Tribe and administered cooperatively. The small population (10–12,000) is approximately ninety percent Navajo. *See* Appellee's Brief at 25–26. The land remains desert grazing land unsuited to agricultural pursuits and not conducive to permanent settlement by large numbers of non-Indians or Indians either. Over time the Interior Department and the Tribe have tried to consolidate as much land as possible in Navajo ownership and have worked

**1420**

with the checkerboarded nature of the land as best they can.

As for a variety of other governmental controls, the Tribe and the federal government have asserted criminal jurisdiction over the allotted areas and on trust lands; while New Mexico has asserted it over lands owned by the state or held privately.[44] Over the decades, New Mexico, the federal government, and the Tribe have carved out differing and sometimes overlapping responsibilities for provision of government services in such fields as education, social services, health, and water and mining regulation; the acts of carving out these responsibilities suggest past understanding on the part of all parties that the area has checkerboard and not reservation status. Just because the area has remained predominantly Navajo has apparently not been a sufficient reason for Congress to establish a permanent reservation on the 709/744 lands in New Mexico. This court is not going to "remake history" and declare a *de facto* reservation in the face of clear congressional intent to the contrary. *See DeCoteau v. District County Court,* 420 U.S. 425, 449, 95 S.Ct. 1082, 1095, 43 L.Ed.2d 300 (1975).

D. *Specific Intent of Restoration Language With Respect to Status of Allotted Lands.*

A question remains as to the current status of the *allotted* lands. Were they terminated from reservation status when the unallotted lands were restored to the public domain, or did they retain reservation status? Arguably, since only the unallotted lands were restored, the allotted lands remain unrestored, i.e., retain their reservation status. On the other hand, the allotted lands could not have been restored to the public domain for title purposes because they were allotted in severalty and had been disposed of; i.e., since they were no longer public lands, they obviously could not be restored for sale and settlement purposes. Therefore, the title implications

of the restoration language used in section twenty-five would have been inapplicable to the allotted lands. Yet the boundary implications of the restoration language could have affected their reservation status, terminating it as soon as the lands were allotted in severalty since the limited purpose of their reservation status had then been accomplished. Acting Interior Secretary Adams spoke to this point, when he stated in his letter of April 12, 1912 to New Mexico Congressman H.B. Ferguson that the more than 319,000 acres allotted to 2,004 Navajos in the 709/744 area "fall outside of the boundaries of existing Navajo Reservation In New Mexico." Ex. 53 at 4. As noted earlier in this opinion, the views of Assistant Secretary Pierce in 1911 and Commissioner of Indian Affairs Cato Sells in 1916 that allotted lands on certain railroad odd-sections could be viewed as reserved lands for purposes of proposed exchanges of railroad land failed to prevail within the Department.

That restoration of unallotted lands to the public domain also cancels reservation status for allotted lands is supported by the method of abolishing an EO reservation initially discussed in *The Public Domain* 243–44 (1880), i.e., restoration language. Cession language such as that construed in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), and *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), need not be the only language clearly signalling the cancellation of reservation boundaries. Especially when a reservation addition is made only for the limited purpose of allotments of some of the land to individual Indians in severalty, the reservation is terminated when the lands are allotted and the remainder restored to the public domain. In the case of the 709/744 extension, there was nothing for the Navajo Tribe to cede, sell, relinquish, or convey back to the United States, unlike cases where reservation status was created by treaty or statute, or by EO for purposes broader than mere allotments in severalty.

---

**44.** The Navajo Tribe also has asserted criminal jurisdiction over Indians without regard to private land status in the EO 709/744 area. *See,*

*e.g.,* the companion case of *Blatchford v. Sullivan,* 904 F.2d 542 (10th Cir.1990).

In seeking language of cession and a compensation plan under the circumstances here, the district court erred.

Comparably, *DeCoteau v. District County Court* concludes that the *allotted* lands within what was the Lake Traverse Indian Reservation lost their reservation status when the unallotted lands were ceded. What they did not lose, however, was their Indian country status under 18 U.S.C. § 1151(c). *DeCoteau* observes that

"historical circumstances make clear ... the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs. In such a situation, exclusive tribal and federal jurisdiction is limited to the retained allotments. 18 U.S.C. § 1151(c). With the benefit of hindsight, it may be argued that the tribe and the Government would have been better advised *to have carved out a diminished reservation, instead of or in addition to the retained allotments.* But we cannot rewrite the 1889 Agreement and the 1891 statute. For the courts to reinstate the entire reservation, on the theory that retention of mere allotments was ill-advised, would carry us well beyond the rule by which legal ambiguities are resolved to the benefit of the Indians."

*DeCoteau,* 420 U.S. at 446–47, 95 S.Ct. at 1094 (emphasis added and omitted) (citation omitted). In other words, *DeCoteau* stands for the proposition that the entire reservation is terminated. It does not hold that the remaining allotments are reservation; instead, they are Indian country by virtue of being allotments under 18 U.S.C. § 1151(c).[45]

*Tooisgah v. United States,* 186 F.2d 93 (10th Cir.1950), reaches a similar result. In *Tooisgah,* Kiowa, Comanche, and Apache Indian tribes ceded and surrendered their claim to reservation land, subject to allotments in severalty to individual members of the tribes. We held that when the tribes ceded and surrendered their claims Congress "intended to dissolve the tribal

government, disestablish the organized reservation, and assimilate the Indian tribes as citizens of the state or territory." *Id.* at 97–98. The remaining allotments were not considered to be retained reservation lands.

In conclusion, the allotted lands do not remain part of the reservation because the restoration of unallotted lands in the 709/744 area left allotted lands under government protection as Indian country but cancelled reservation boundaries. As the Navajos understood at the time, the lands were withdrawn for allotment purposes exclusively and none other. Under the 709/744 EOs, they were "reserved" only for allotment purposes.

That the Arizona portion of the original 709/744 area retains reservation status today is a product of history and not solely of its original inclusion in EO 709. Only the New Mexico portion of the 709/744 area was subject to EOs 1000/1284. Unlike the situation in New Mexico, there was never any promise to restore unallotted lands in Arizona, *see* Ex. 41, nor was there agitation for opening the Arizona portion, *see* Ex. 46. At the time the New Mexico portion was restored, restoration of the Arizona portion was impossible because the lands had not even been surveyed and, therefore, no legal description of lands subject to possible restoration was available. Ex. 46. The status of the Arizona portion was clarified when Congress conferred permanent reservation status under the Act of June 14, 1934, ch. 521, 48 Stat. 960.

The fact that the 709/744 area in New Mexico remains checkerboarded Indian country in a way that may complicate jurisdictional questions in civil cases such as this one creates an issue for examination on remand. The Supreme Court has allowed such checkerboarding to stand in cases such as *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, and *United States v. Pelican,* 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914). It is well to remember that Con-

---

**45.** 18 U.S.C. § 1151 provides that "Except as otherwise provided ..., the term 'Indian country,' as used in this chapter, means ... (c) all

Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

gress has authorized checkerboard jurisdiction under its definition of Indian country in 18 U.S.C. § 1151. Although subsection 1151(a) clarifies that checkerboard *titles* within an existing reservation do not affect the status of an Indian reservation as reservation, subsections 1151(b) and (c) allow checkerboard *jurisdiction* outside reservation boundaries.[46] Checkerboard title problems have been with the New Mexico 709/744 area since the 1907–11 allotment period. The Tribe has been engaged in active land consolidation activity and fifty-five percent of the surface rights in the area are owned, at least beneficially, either by individual Navajos or by the Tribe. Nonetheless, the land is not Indian reservation, although presumably much of it is Indian country. To what extent the surface rights of the South McKinley Mine are held by the Navajo Tribe or by Navajo allottees is a factual determination to be made on remand.

### E. *Conclusion.*

We hold that the district court erred in concluding that the 709/744 area in New Mexico retained reservation status. We remand for consideration of whether some or all of P & M's South McKinley Mine is within Indian country under 18 U.S.C. §§ 1151(b) or (c) and, if so, whether the court is obligated to abstain from initially deciding whether the Tribe can tax P & M's source gains from the mine.

One final point remains to be made—about abstention at an earlier stage of the proceedings. In *National Farmers Union Insurance Cos. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mutual Insurance Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), the Supreme Court held that issues of civil subject-matter jurisdiction over non-Indians on Indian reservations should be heard first, as a matter of comity, in tribal court when federal question or diversity jurisdiction is present. The holdings of the cases, however, did not extend to issues where reservation boundaries, in contrast to subject-matter jurisdiction, were at issue, as is the case here. The Tenth Circuit has followed both cases in the context of civil disputes arising on reservation land but has not had the occasion to rule on whether the federal courts should abstain from an initial determination of the extent of a tribe's territorial jurisdiction. *See Brown v. Washoe Housing Auth.,* 835 F.2d 1327 (10th Cir.1988); *Superior Oil Co. v. United States,* 798 F.2d 1324 (10th Cir.1986). Because the Tribe did not appeal the district court's determination that it need not abstain from exercising federal question jurisdiction to decide whether or not the 709/744 area was within Indian country, the Tribe is precluded from raising the issue on remand. We decline the invitation of amici Cheyenne–Arapaho Tribes of Oklahoma and the Native Village of Venetie to address this question sua sponte. Resolution of this issue can await another day.

**46.** 18 U.S.C. § 1151 provides in its entirety that "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country,' as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

NAVAJO RESERVATION
ADDITIONS/RESTORATIONS

## APPENDIX A

PLAINTIFF'S
EXHIBIT
2

| | | | |
|---|---|---|---|
| A | Original treaty reservation. June 1, 1868. | H | Executive-order addition. March 10, 1905. |
| B | Executive-order addition. October 29, 1878. | I | Executive-order addition. November 9, 1907. |
| C | Executive-order addition. January 6, 1880. | J | Executive-order addition. November 9, 1907; restored to public domain by executive order of January 16, 1911. |
| CC | Originally a part of "C"; withdrawn from the reservation by executive order, May 17, 1884; restored by executive order, April 24, 1886 | K | Executive-order addition. November 9, 1907; restored to public domain by executive order of December 30, 1908. |
| D (two parts) | Executive-order addition. May 17, 1884. | | |
| E | The Paiute Strip. Originally a part of "D"; in 1872 restored to the public domain; in 1908 withdrawn for the use of various Indians; restored to public domain in 1922; in 1929 again withdrawn from entry, 1933 transferred permanently to the Navajo reservation. | L | Tusayan Forest addition. Act of May 23, 1930. |
| | | M | Executive-order addition. May 7, 1917. |
| | | N | Act of March 1, 1933. |
| | | O (three parts) | Arizona Boundary Act of June 14, 1934. |
| F | Executive-order addition. January 8, 1900. | P | Tusayan Forest addition. Act of February 21, 1933. |
| G | Executive-order addition. November 14, 1901. | Q | Hopi reservation. Executive-order reservation created on December 16, 1882. |

APPENDIX B

In the United States District Court for the District of New Mexico

Herbert Charles Blatchford, Jr., Petitioner,

vs.

Harvey Winans, et al., Respondents.

CV No. 84–0384 HB

April 3, 1987

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter comes before the court on the Magistrate's Amended Proposed Findings and Recommended Disposition and the parties' objections to same. The court, having considered the parties' objections, reviewed the record and the Magistrate's Proposed Findings *de novo,* and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

1. Harvey Winans is no longer petitioner's custodian. George Sullivan is petitioner's custodian and should replace Harvey Winans as a respondent in this proceeding.

2. Petitioner was convicted by jury in July 1978 of criminal sexual penetration of a child as an accessory and of kidnapping as an accessory. He was sentenced by the McKinley County District Court to life imprisonment on the first count and to imprisonment for 10 to 50 years on the second count. He is presently confined by the State at the New Mexico State Hospital in Las Vegas, New Mexico. Petitioner seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. Counsel has been appointed for petitioner. Respondent has filed a motion to dismiss the petition on the ground that petitioner has failed to exhaust his state remedies. Petitioner has filed a motion for summary judgment. Both motions have been fully briefed by the parties. An evidentiary hearing has been held. The court has taken judicial notice of its file and the state court record as submitted by the parties. Fed.R.Evid. 201.

3. Petitioner is an enrolled member of the Navajo Tribe, as were the victims of the crimes of which petitioner was convicted.

4. Petitioner alleges in this federal petition that the crimes for which he was convicted occurred in the community of Yah–Ta–Hey. Yah–Ta–Hey lies within Section 7, Township 16 North, Range 18 West, N.M.P.M.

5. As grounds for relief in this federal petition, petitioner argues that his conviction is invalid because the McKinley County District Court lacked jurisdiction to try him. Petitioner asserts he was convicted of crimes over which the United States has exclusive criminal jurisdiction pursuant to the Major Crimes Act, 18 U.S.C. § 1153. The Major Crimes Act provides for exclusive federal criminal jurisdiction over the crimes of rape and kidnapping when those crimes are committed by an Indian perpetrator within Indian country. For purposes of § 1153, "Indian country" is defined in 18 U.S.C. § 1151 as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government ..., (b) all dependent Indian communities within the borders of the United States ..., and (c) all Indian allotments, the Indian titles to which have not been extinguished ..." In Ground One of this petition, petitioner asserts that the Yah–Ta–Hey area is Indian country within the purview of the Major Crimes Act because it lies within the Navajo Reservation as extended by Executive Order 709 (November 11, 1907). In Ground Two, petitioner asserts that the Yah–Ta–Hey area is Indian country within the purview of the Major Crimes Act because it is a dependent Indian community. There is no claim that the crime occurred on allotted Indian lands.

6. The state court procedural history underlying this federal habeas corpus proceeding may be summarized as follows: Petitioner was convicted in and sentenced by McKinley County District Court in July 1978. Petitioner took a direct appeal to the New Mexico Supreme Court in August 1978. That appeal was premised solely upon trial errors, none of which are at

issue in this federal habeas corpus proceeding. The state supreme court affirmed his conviction in March 1979. Petitioner next filed a petition for habeas corpus relief in San Miguel County District Court, the judicial district wherein he was confined, in January 1982. Following an evidentiary hearing, the state district court ruled in petitioner's favor in May 1982. Respondent appealed the district court's action to the state supreme court in June 1982. The state supreme court reversed the district court in July 1983. *Blatchford v. Gonzales*, 100 N.M. 333, 670 P.2d 944 (1983). Following the supreme court's order of reversal, petitioner filed a motion pursuant to Rule 57, New Mexico Rules of Criminal Procedure, in McKinley County District Court, the district wherein he was sentenced, in October 1983. That motion was dismissed without a hearing in January 1984 and a judgment of dismissal was entered in February 1984. Petitioner took no further state court action. He filed this federal petition in March 1984.

7. On May 17, 1984, respondent filed his Answer to this petition, conceding therein that petitioner had exhausted his state postconviction remedies "as to each ground on which he requests action by the federal government." Following a pre-trial status conference on November 20, 1985, this court, based on the record then before it and the representations of counsel with regard to that record, determined that the issues raised in this federal action had been exhausted in the state courts. By letter on November 29, 1985, the court so advised the parties. On February 6, 1986, respondent filed a motion to dismiss alleging that petitioner has failed to exhaust his state postconviction remedies. In his supporting memorandum, respondent withdrew his earlier concession of exhaustion pursuant to *Naranjo v. Ricketts*, 696 F.2d 83 (10th Cir.1982).

8. Respondent bases his motion to dismiss on two arguments. First, he argues that Ground One of the petition should be dismissed because petitioner did not fairly present that claim to the state courts. Second, he argues that the petition should be dismissed *in toto* because petitioner failed to pursue a habeas corpus petition pursuant to N.M.R.Crim.Proc. 57(j) once his Rule 57 motion was dismissed.

9. Respondent's argument for dismissal of Ground One of the petition because it was not fairly presented to the state courts is not well taken. Both the factual and the legal bases for petitioner's claim that, pursuant to 18 U.S.C. § 1151(a), Yah–Ta–Hey is Indian country within the purview of the Major Crimes Act because it is located within the Executive Order 709 extension to the Navajo Reservation have been fairly presented to the state courts as follows:

In the course of deciding petitioner's request for habeas corpus relief, San Miguel County District Judge Martinez by letter dated March 25, 1982, requested additional information regarding the territorial limits of the Navajo Reservation. Counsel for petitioner responded by providing the judge with copies of Executive Orders 709 and 744 and a brief arguing that Section 7 was made a part of the Navajo Reservation by those executive orders. Respondent now concedes that the issue of the reservation status of the Yah–Ta–Hey area was raised in the state district court habeas corpus proceeding. See Respondent's letter of July 23, 1986 and attachments thereto.

The bases for petitioner's claim that the Yah–Ta–Hey area was made a part of the Navajo Reservation by executive order were initially placed before the New Mexico Supreme Court by the San Miguel County District Court Findings and Conclusions from which respondent appealed. Finding Nos. 12, 27, 31, 32, 34 and 36 in general and Finding No. 2, 30, 33, 39 and 42 and Conclusion No. 2 in particular placed the issue of the reservation status of Yah–Ta–Hey before the state supreme court. In addition, pages 12–22 of petitioner/appellee's Answer Brief in the supreme court proceedings extensively argued the annexation of the Yah–Ta–Hey area by executive order. It appears from the court's opinion in *Blatchford v. Gonzales*, 100 N.M. 333, 670 P.2d 944 (1983), that the court did in fact consider petitioner's reservation status ar-

gument within the context of determining whether Yah–Ta–Hey was a dependent Indian community. The court discussed whether Executive Order 2513 annexed the Yah–Ta–Hey area to the Navajo Reservation. 100 N.M. at 336–37, 670 P.2d 944. The supreme court did not specifically address Executive Orders 709 and 744 in its opinion. However, it is clear from the court's discussion of Order 2513 that petitioner's evidence with regard to the reservation status of Yah–Ta–Hey was considered by the court and was not stricken pursuant to respondent's motion to do so. The exhaustion doctrine does not require that the state appellate court discuss every issue raised by petitioner's brief. *See Smith v. Digmon,* 434 U.S. 332, 333, 98 S.Ct. 597, 598, 54 L.Ed.2d 582 (1978)

In October of 1983 petitioner filed a Rule 57 motion in McKinley County District Court. As a ground for that motion, petitioner stated that the court was without jurisdiction to try him because Section 7 is within the Navajo Reservation as extended by executive order. In support of the motion, petitioner attached and incorporated therein his Answer Brief filed in *Blatchford v. Gonzales, supra,* with specific reference to those portions of the brief discussing the executive order extension.

In sum, the court finds that petitioner has fairly presented his claim set forth as Ground One in this federal petition to the state courts. *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Jones v. Hess,* 681 F.2d 688 (10th Cir.1982).

10. · Respondent's argument for dismissal of the petition *in toto* on grounds of procedural default also is not well taken. Despite the New Mexico Supreme Court's declaration in *Blatchford v. Gonzales, supra,* that the San Miguel County District Court was procedurally barred from hearing petitioner's cause, the court went on to discuss the merits of petitioner's jurisdictional claims. With regard to petitioner's § 1151(a) claim, set forth as Ground One in this federal petition, the court stated that

Yah–Ta–Hey is not located on an Indian reservation. 100 N.M. at 335, 670 P.2d 944. The court further concluded that an executive order issued after the 1866 sale of Yah–Ta–Hey area land to the railroad failed to effect annexation of those lands to the Navajo Reservation. 100 N.M. at 336–38, 670 P.2d 944. With regard to petitioner's § 1151(b) claim, set forth as Ground Two in this federal petition, the court held that Yah–Ta–Hey is not a dependent Indian community. 100 N.M. at 336–35, 670 P.2d 944. Because the state supreme court considered the merits of petitioner's claims despite his failure to comply with N.M.R. Crim.Proc. 57(j), this court may properly reach the merits of those claims now. *Hux v. Murphy,* 733 F.2d 737 (10th Cir.), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985), *overruled on other grounds, Wiley v. Rayl,* 767 F.2d 679 (10th Cir.1985); *Morishita v. Morris,* 702 F.2d 207 (10th Cir.1983).

11. Even assuming, *arguendo,* that *Hux, supra,* and *Morishita, supra,* do not apply to overcome petitioner's state procedural default, it is clear that forcing petitioner to return to the state courts would be a futile act. A federal court may excuse a failure to exhaust state remedies if it is affirmatively shown that resort to them would be an idle or useless effort. *Clonce v. Presley,* 640 F.2d 271, 273 (10th Cir. 1981); *Lewis v. State of New Mexico,* 423 F.2d 1048, 1049 (10th Cir.1970). This court finds that the circumstances of this case constitute such a showing. The highest state court has addressed—and rejected— both of petitioner's federal claims, *Blatchford v. Gonzales, supra,* thus rendering petitioner's chance of a hearing on the merits in a state forum negligible, at best. *See generally, Adkins v. Bordenkircher,* 674 F.2d 279, 281–82 (4th Cir.1982); *Sweet v. Cupp,* 640 F.2d 233, 236 (9th Cir.1981). That petitioner's return to state court would be a futile exercise is further evidenced by the McKinley County District Court's response to petitioner's October 1983 Rule 57 motion. The state district court denied petitioner's motion and in February of 1984 entered a judgment of dismissal on the grounds that

it appearing that the Supreme Court of New Mexico has recently ruled against defendant on the precise issues raised by his motion in *Blatchford v. Gonzales,* 100 N.M. 333, 670 P.2d 444 [944] (1983), *appeal dismissed sub nom. Blatchford v. Winans,* 464 U.S. 1033, 104 S.Ct. 691, 79 L.Ed.2d 158 (1983 [1984] ); and it further appearing that the motion is not well-taken ...

Because it would be fruitless to require petitioner to return to state court, this court finds that petitioner has satisfied the exhaustion requirement imposed by § 2254(b). Furthermore, petitioner should not be forced to resubmit issues already raised and decided by the state supreme court. The exhaustion requirement is met by providing the highest court in the state a fair opportunity to consider the federal issue, *Wallace v. Duckworth,* 778 F.2d 1215, 1219 (7th Cir.1985), which has been done in this instance.

12. For the reasons set forth in paragraphs 9, 10 and 11 of these findings, respondent's motion to dismiss for failure to exhaust state remedies should be denied.

13. On February 7, 1986, petitioner filed a motion for summary judgment alleging that a writ of habeas corpus should issue to discharge petitioner from custody on the ground that he is illegally confined pursuant to a conviction void for lack of jurisdiction. A motion for summary judgment is properly granted only when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In ruling on a summary judgment motion the court must view the pleadings and the evidence in the light most favorable to the party opposing the motion. *See Harsha v. United States,* 590 F.2d 884, 887 (10th Cir.1979). Summary judgment "is considered a drastic relief to be applied with caution." *Redhouse v. Quality Ford Sales, Inc.,* 511 F.2d 230, 234 (10th Cir.1975). Respondent's response to petitioner's summary judgment motion demonstrates that genuine issues of fact exist with regard to essential elements of both grounds urged by petitioner as bases for habeas corpus relief. This court therefore finds that petitioner's motion for summary judgment should be denied.

14. In Ground One of this federal petition, petitioner asserts that the Major Crimes Act, 18 U.S.C. § 1153, vests the United States with exclusive jurisdiction to try him because the crimes for which he was charged occurred within the Navajo Reservation as extended by Executive Order 709 (November 11, 1907), as amended by Executive Order 744 (January 28, 1908). Petitioner argues that neither a subsequent congressional enactment, § 25 of the Act of May 29, 1908, ch. 216, 35 Stat. 444, 457, nor two subsequent presidential proclamations, Executive Order 1000 (December 30, 1908) and Executive Order 1284 (January 16, 1911), operated to withdraw the Executive Order 709 lands from the Navajo reservation.

15. On November 9, 1907, President Theodore Roosevelt issued Executive Order Number 709 which added approximately 1.9 million acres to the Navajo Indian Reservation in Arizona and New Mexico. On January 28, 1908, Executive Order Number 744 was issued amending Executive Order Number 709 to correct an encroachment on the Jicarilla Apache Reservation. By issuing these Executive Orders, the President intended that a temporary reservation of the lands be made until such time as the Indian occupants could receive allotments from the lands so set aside.

16. In response to the concerns of non-Indian settlers, a joint resolution was introduced in Congress and passed which provided:

That whenever the President is satisfied that all the Indians in any part of the Navajo Indian Reservation in New Mexico and Arizona created by Executive Orders of November ninth, nineteen hundred and seven, and January twenty-eighth, nineteen hundred and eight, have been allotted, the surplus lands in such

part of the reservation shall be restored to the public domain and opened to settlement and entry by proclamation of the President.

Act of May 29, 1908, ch. 216, § 25, 35 Stat. 444, 457.

On December 30, 1908, the President issued Executive Order Number 1000 "restoring to the public domain" unallotted lands within certain sections of the reservation created by Executive Order Number 709, as amended by Number 744, with certain exceptions. Three years later, on January 16, 1911, President Taft issued Executive Order Number 1284, restoring additional surplus lands to the public domain. The Yah–Ta–Hey area where the crime allegedly took place is within the acreage added to the reservation and subsequently restored to the public domain by the Executive Orders.

17. The resolution of a dispute involving diminishment of reservation boundaries "turns on what Congress intended to accomplish at the time as a legal matter." *Ute Indian Tribe v. Utah*, 716 F.2d 1298, 1301 (10th Cir.1983), *reh. en banc*, 773 F.2d 1087 (1985), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). The effect of any given surplus land Act, which § 25 of the Act of May 29, § 1908 was, depends on the language of the Act and the circumstances underlying its passage. *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).

Diminishment will not be lightly inferred. Analysis of surplus land Acts require that Congress clearly evince an intent to change boundaries before diminishment will be found. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

When both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian Lands, we are bound by our traditional solicitude for the Indian Tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.

*Solem, supra,* 465 U.S. at 472, 104 S.Ct. at 1167. Once land is set aside as an Indian reservation, what happens to the title of individual plots within the area does not change the reservation status of the area until Congress explicitly indicates otherwise. *Solem, supra,* 465 U.S. at 470, 104 S.Ct. at 1166.

18. The most probative evidence of congressional intent is the statutory language used to open the Indian lands. *Solem, supra,* 465 U.S. at 470, 104 S.Ct. at 1166. The operative language of § 25 of the Act of May 29, 1908, requires that the Executive Order 709 lands "shall be restored to the public domain and opened to settlement and entry by proclamation of the President."

The United States Supreme Court has stated that "public domain" language is not dispositive when such references are isolated phrases within a statute as a whole. *Solem, supra* at 465 U.S. at 475–76, 104 S.Ct. at 1168–69. In the instant case, the public domain wording is not isolated phraseology but is in fact the operative language of § 25. However, standing alone this language is not sufficient to indicate a clear congressional intent to subtract the Executive Order 709 area lands from the Navajo Reservation.

Our conclusion is that the phrase "restore to the public domain" is not the same as a congressional state of mind to disestablish. In other words, it doesn't disturb the ownership of the land by the tribal group. There are several competing meanings that could be implied from the phrase "restore to the public domain." But the most important one is that it permits the invasion of an area and purchase of land and general utilization. It is said that it is equally plausible that the phrase means that Indian lands would be available for settlement, but that the boundaries remain unchanged. The original expression "return to the public domain" does not reliably establish the clear and unequivocal evidence of Congress' intent to change boundaries. *Ute Indian Tribe v. Utah*, 773 F.2d 1087, 1092 (1985). (See also concurring opinion

at 1095), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). Allotment and subsequent entry by non-Indians is consistent with continued reservation status. *Mattz v. Arnett,* 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973).

19. This court, therefore, must consider whether contemporaneous events surrounding the passage of Executive Order 709 or the legislative history of § 25 unequivocally reveal a widely held contemporaneous understanding that the Executive Order 709 area lands would be removed from the Navajo Reservation. Taken as a whole, the contemporaneous historical documents presented to this court do reveal a clear congressional intent and understanding that the reservation status of the Executive Order 709 area lands was temporary and that the land not allotted would revert back to its pre 1907 non-reservation status.

Roosevelt understood that the reservation was temporary when he signed Executive Orders 709 and 744. This understanding is evidenced by a letter from C.F. Larrabee, then acting Commissioner of Indian Affairs, to J.S. Sherman, Chairman of the House Committee on Indian Affairs. The President, the Secretary of the Interior and the Commissioner of Indian Affairs viewed the withdrawal as temporary in order to facilitate an ongoing allotment to the Navajos living on public domain land. There was a concern that the Navajos were being pushed out by white settlers in the area and that temporary measures were necessary to protect the Navajos until the allotment project could be completed. Respondent's Exhibits G, H, J, and K. This understanding, although not dispositive in itself given its historical context, is evidence that the Executive Orders were never intended to enlarge permanently the reservation boundaries, but instead were meant as a temporary remedial measure.

20. At that time in history, Congress assumed that assimilation would occur and that the reservation system would be dismantled. That was the purpose of the General Allotment Act of 1887. Therefore, all reservations were viewed as temporary until allotment could be completed. However, allotment did not in fact lead to the dismantling of the reservations. *Solem* cautions that a specific congressional purpose to diminish reservations is not to be extrapolated from Congress' expectation of the imminent demise of the reservation system. Rather each surplus land Act needs to be examined in light of its particular context to see if Congress intended to absolutely terminate or diminish a particular reservation regardless of their ultimate understanding that the reservation system would soon be terminated.

The legislative history of § 25 and the surrounding circumstances clearly indicate that Congress shared the Executive branch's concern with protecting the Navajos living on public land near the reservation and then reopening the area to settlement. Congress' intent was to disestablish Executive Order 709 land as soon as the Navajos who had settled off the reservation were secure in their land.

> You are advised that, because of the large number of Indians residing on public lands adjacent to the Navajo Reservation in New Mexico and Arizona without any title to the lands occupied by them, it was necessary, in order to protect them in their homes, that a temporary reservation of the lands be made until such time as the Indian occupants could be allotted. It was not and is not the intention of the Department that lands which will not be needed for allotment purposes be withheld from settlement and entry any longer than will absolutely be necessary to insure the Indians securing their homes under authority of law without interference from white settlers.

H.R.Rep. No. 1663, 60th Cong., 1st Sess. 1–2 (1980) (Excerpt of letter by C.F. Larrabee, Acting Commissioner of Indian Affairs to the Honorable J.S. Sherman, Chairman, House Committee on Indian Affairs).

This is not a case of long established reservation land. In fact, the Executive Order reservation remained in existence for less than four years, some of it less than 14 months. Executive Order 709 land was never viewed as reservation land before Executive Order 709. It was given its sta-

tus as reservation land for the sole purpose of allotment to the Navajos then living there before public entry was allowed. There is no indication that the temporary withdrawal was viewed as anything more than a stop gap measure to insure that the Navajo's living on public land would be secure in that land in light of the pressure of new settlement in the area.

21. The Executive Orders numbered 1000 and 1284 do not, by their language, lend any support to a finding that the intention of Congress in § 25 was to disestablish Executive 709 lands. The Executive Orders use the identical language of "restored to the public domain" which was used in § 25 and has already been found not to evince a clear intent to disestablish. However, the speed with which allotment and restoration occurred through the Executive Orders indicates that the Executive branch continued to regard Executive Order 709 and 744 as only a temporary expedient to protect Navajo settlers. See Respondents' Exhibit AA. This understanding is further evidenced by the correspondence of the Secretary to Representative Andrews from New Mexico.

> While it is true that lands have been withdrawn from public entry on the east and south of the Navajo Indian Reservation, the action is merely temporary and solely for the purpose of permitting the allotment of the Indians residing within the boundaries of the withdrawn tract undisturbed by contacts and interference of white citizens. It is the intention of the Department to expedite these allotments and when they shall have been completed to have the unallotted part of the tract restored to the public domain.

Respondent's Exhibit P. *See also* Respondent's Exhibits R, T and U.

22. During the time that the land was withdrawn, allotments were only made to Navajos who had previously lived in that area. Respondents' Exhibits X, Y and Z. This is in keeping with the government's understanding that the withdrawal was only for the purpose of protecting existing Navajo settlers and not for the purpose of expanding the reservation.

23. Moreover, evidence before the court indicates that in the 1920's and the 1930's Congress rejected boundary legislation which would have established New Mexico Executive Order lands as a part of the Navajo Reservation. Although the court is mindful that subsequent congressional actions should be accorded less weight than the statutory language and attendant surrounding circumstances, the court finds that these subsequent events indicate a clear understanding on the part of the United States Congress that the lands in question had not become a permanent addition to the Navajo Reservation upon the issuance of Executive Order 709.

24. The executive branch also continued to function under the impression that the extension had been withdrawn. *See, e.g.,* Executive Order 1483 (February 15, 1912) restoring certain Executive Order 709 land to the reservation which had been "eliminated from said reservation by Executive Order of January 16, 1911," in order to facilitate an exchange of railroad land under the Act of April 21, 1904, 33 Stat. 211. *See also* Respondent's Exhibits CG, CH and CO. Again by Executive Order 2513 (January 15, 1917) President Wilson found it necessary to withdraw previously withdrawn Executive Order 709 land in order to negotiate an exchange of land with the railroad for the Navajos. Respondent's Exhibit CR.

25. Petitioner's first claim for relief is without merit. The situs of the alleged crime is not a part of the Navajo reservation. The legislative history of § 25 and the historical events surrounding the issuance of Executive Orders 709, 744, 1000 and 1284 show that Executive Order 709 was never intended to create a permanent reservation but was issued only to withdraw the lands temporarily to be allotted to individual Indians. It was always intended by Congress and the Executive branch that the unallotted lands be restored to the public domain as quickly as possible with the same status it occupied before it was withdrawn by Executive Order 709.

26. In Ground Two of this federal petition, petitioner asserts that the Major

Crimes Act, 18 U.S.C. § 1153, vests the United States with exclusive jurisdiction to try him because the crimes for which he was charged occurred within a dependent Indian Community. In order to evaluate petitioner's dependent Indian community claim, the Court must initially decide what is the proper community of reference. The court notes that petitioner at paragraph 4 of his January 1982 San Miguel County District Court habeas petition alleged that the crimes of which he was convicted occurred at Yah–Ta–Hey, McKinley County, New Mexico. The State raised no argument with regard to this characterization of the crime situs by petitioner, and the San Miguel County District Court adopted this characterization in its May 1982 Findings of Fact. The same characterization was incorporated, without discussion or analysis, in all subsequent state court post-conviction proceedings.

Upon a review of the entire record now before it, the court finds that the proper community of reference for purposes of petitioner's § 1151(b) claim is Yah–Ta–Hey which includes the intersection of U.S. Highway 666 and State Highway 264, Navajo Estates and the surrounding area within a 3 to 5 mile radius of the crossroads. Although in a rural area such as this it is difficult to define with precision the exact boundaries of a community, this court finds that Yah–Ta–Hey and the surrounding area is a readily identifiable residential and trading community for purposes of petitioner's § 1151(b) claim. *See United States v. Mazurie,* 419 U.S. 544, 552, 95 S.Ct. 710, 715, 42 L.Ed.2d 706 (1975); *United States v. Morgan,* 614 F.2d 166, 170 (8th Cir.1980) (precise boundaries not required in concept of community). The magistrate's proposed finding that Navajo Estates is the relevant community is rejected on the grounds that Navajo Estates is nothing more than a small housing subdivision within the larger community of Yah–Ta–Hey, a community which includes the subdivision of Navajo Estates, the commercial center which has grown up at the highway intersection and the rural community surrounding the intersection, which depends on the commercial center at the crossroads for certain community services such as postal service and business trade.

27. Having found that the proper community of reference is Yah–Ta–Hey the court must next find whether that community is a dependent Indian community pursuant to § 1151(b). In making this determination, the court must consider evidence of the following factors: "the nature of the area in question, the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area," *United States v. Martine,* 442 F.2d 1022, 1023 (10th Cir.1971); whether there is an element of cohesiveness in the community, as manifested by economic pursuits, common interests, or needs of the inhabitants, *United States v. Morgan,* 614 F.2d 166, 170 (8th Cir.1980); and whether the community has been set apart for the use, occupancy or protection of dependent Indians, *Weddell v. Meierhenry,* 636 F.2d 211, 213 (8th Cir.1980), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981). *See also United States v. Levesque,* 681 F.2d 75 (1st Cir.1982); *United States v. State of South Dakota,* 665 F.2d 837 (8th Cir.1981); *United States v. Oceanside Oklahoma, Inc.,* 527 F.Supp. 68 (W.D. Okla.1981); *United States v. Mound,* 477 F.Supp. 156 (D.S.D.1979).

28. *Title to the Land.*

The commercial crossroads area and Navajo Estates are located on non-Indian land. However the surrounding area is predominately Navajo allotment land upon which the Navajos continue to reside and graze livestock.

29. *Composition of the Community.*

The population at the crossroads itself is predominately non-Indian. The businesses in the area are owned by non-Indians and Navajo Estates is slightly more non-Indian than Navajo. However, the area around the crossroads is predominately rural Navajo. In 1977, at the time of the incident in question, there was another small housing development at the crossroads which was predominately if not exclusively Navajo.

30. *Purpose of the Community.*

The community of Yah–Ta–Hey is mainly a trading post area where local merchants buy Navajo made goods, then distribute them in other locations. There is also evidence that Yah–Ta–Hey has become a suburb of Gallup, that Gallup is a source of jobs and the commercial center which the people living at Yah–Ta–Hey look to.

31. *Relationship of the Community to the Federal Government and to the Navajo Nation.*

There is testimony by a number of witnesses that in recent years and at the present time the Navajo Tribe, independently and with federal monies, makes available and provides to residents of Yah–Ta–Hey a variety of health, social welfare and law enforcement services. However, except for law enforcement services, the residents must travel outside of the Yah–Ta–Hey vicinity to receive those services. Indeed Navajos at Yah–Ta–Hey must travel to Gallup to receive many of the services which are provided by the Navajo Nation. There does not appear to be any special relationship between the Ya–Ta–Hey area and the federal government which would suggest a finding that the area is a dependent Indian community.

32. *Relationship of the Community to State and County Government*

The State of New Mexico, McKinley County and the City of Gallup also provide services to the inhabitants of Yah–Ta–Hey including law enforcement, water, roads, land fills and public schools. The businesses at Yah–Ta–Hey pay state gross receipts tax and McKinley County property tax. They are subject to state and county regulations regarding health standards, building codes, pawn shops, unemployment compensation, workman's compensation and liquor sales.

33. Considering these factors against the statute and the case law, the court finds that petitioner has not met his burden of showing by a preponderance of the evidence that in December 1977, the date of the crimes for which he was convicted, the community of Yah–Ta–Hey was a dependent Indian community. Although petitioner has established that Indians are predominant in the area and that those Indians receive services from the Navajo Nation, that by itself is insufficient to show that Yah–Ta–Hey is a dependent Indian community. *See Weddell v. Meierhenry*, 636 F.2d at 213; *United States v. Martine*, 442 F.2d at 1024. There is no evidence that this area has been set aside for the use occupancy or protection of the Navajos or that the federal government has any special relationship with the community. The state asserts jurisdiction over the area and provides many services to the residents and business at Yah–Ta–Hey.

Now, Therefore,

IT IS BY THE COURT ORDERED that:

1. George Sullivan is now the respondent in this proceeding, replacing Henry Winans;

2. Petitioner's motion for summary judgment and motions to strike are denied;

3. Respondent's motion to dismiss is denied;

4. Respondent's motion to submit additional evidence is granted; and

5. The petition of Herbert Blatchford and this action are hereby dismissed with prejudice.

/s/ Howard C. Bratton
Senior Judge

APPENDIX C

ATTACHMENT A

In the United States District Court for the District of New Mexico

The Pittsburg & Midway Coal Mining Company, Plaintiff,

v.

Stella Saunders, et al., Defendants.

No. 86-1442-M Civil

Aug. 22, 1988

MEMORANDUM OPINION AND ORDER

This matter came on for consideration on the defendants' motion to dismiss without

prejudice. Having considered the motion, the response thereto, and being otherwise fully advised in the premises, I find that the motion is well taken and it will be granted.

## Background

The plaintiff, Pittsburg & Midway Coal Mining Company (P & M), brought this action for a declaratory judgment against the Navajo Tax Commission (the Tribe). P & M sought a judgment declaring that the Tribe acted illegally in taxing certain of P & M's activities and enjoining the Tribe from further taxation of such activities. The Tribe moved for dismissal arguing that P & M must exhaust its tribal remedies before pursuing this matter in federal court. In so moving, the Tribe relied upon *National Farmers Union Insurance Companies v. Crowe Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985) and *Iowa Mutual Insurance Co. v. La Plante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

In due course, I informed the parties that in both *National Farmers* and *Iowa Mutual,* as well as in all cases citing to *National Farmers* and *Iowa Mutual,* it was undisputed that the incident or transaction giving rise to the lawsuit had taken place on an Indian reservation. In order to entertain the Tribe's arguments concerning the so-called Indian Abstention Doctrine of *National Farmers/Iowa Mutual* abstention, it would be necessary to determine whether P & M's South McKinley mine is in fact on the Navajo Reservation, or is at least in "Indian Country" within the meaning of 18 U.S.C. § 1151. I therefore called for an evidentiary hearing on the matter, which was held on May 23 through 27, 1988 and continued on July 11 through July 18. The following opinion constitutes my Findings of Fact and Conclusions of Law as a result of that hearing.

## Opinion

President Roosevelt issued Executive Order No. 709 on November 9, 1907, adding 1.9 million acres to the Navajo Reservation (Reservation). Executive Order 709 states in relevant part that the area be "withdrawn from sale and settlement and set apart for the use of the Indians as an addition to the present Navajo Reservation." Executive Order No. 744, issued on January 28, 1908, amended Executive Order 709 to cure an encroachment on the Jicarilla Reservation. The P & M mine is located in part on the 709/744 area.

On May 29, 1908, Congress passed the following Surplus Land Act:

That whenever the President is satisfied that all the Indians in any part of the Navajo Indian Reservation in New Mexico and Arizona created by Executive orders of November ninth, nineteen hundred and seven, and January twenty-eight, nineteen hundred and eight, have been allotted, the surplus lands in such part of the reservation shall be restored to the public domain and opened to settlement and entry by proclamation of the President.

Act of May 29, 1908, ch. 216, § 25, 35 Stat. 444, 457.

On December 30, 1908, President Roosevelt acted on the authority granted under the 1908 Act (the Act). In Executive Order 1000, he directed that the unallotted lands within a portion of the 709/744 area "set apart for the use of the Indians as an addition to their Navajo reservation ... be ... restored to the public domain...." Finally, on January 16, 1911, President Taft issued Executive Order No. 1284 and "restored to the public domain" all remaining unallotted lands "added to the Navajo Reservation" by Executive Orders 709/744.

The question for decision is whether the Act and the execution of it in Executive Orders 1000 and 1284, (1) shrunk the jurisdictional boundaries of the Navajo Reservation, or (2) merely opened the unallotted portions of the 709/744 area to settlement, leaving the jurisdictional boundaries intact. The Supreme Court established the analytical framework for deciding this question in *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).

*Solem* proceeds from two basic principles. First, once land is set aside as an

Indian Reservation, the land remains reservation "until Congress explicitly indicates otherwise." *Id.* at 470, 104 S.Ct. at 1166 citing *U.S. v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909). Second, the intent of Congress to diminish the boundaries of a reservation "will not be lightly inferred." *Solem, supra* at 470, 104 S.Ct. at 1166. It is not enough that a surplus land act show congressional intent to open unallotted lands to settlement, for every surplus land act does that. Diminishment requires "substantial and compelling evidence" in the language of any such act and its legislative history of congressional intent to shrink the exterior jurisdictional boundaries. *Id.* at 472, 104 S.Ct. at 1167. The absence of such evidence mandates a finding that "the old reservation boundaries survived the opening." *Id.*

### 1. Language of the Act.

The strongest evidence of congressional intent is "the statutory language used to open the Indian lands." *Id.* at 470, 104 S.Ct. at 1166. In this case, neither the act nor the implementing executive orders contains language referring to the boundaries of the reservation, let alone any "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests...." *Id.* Neither is there language referring to any congressional plan to pay the tribe back for the opened land. *Id.*

P & M argues that "restored to the public domain" in the Act and the executive orders indicates congressional intent to shrink the boundaries of the reservation. These words are certainly evidence of diminishment. *Id.* at 475, 104 S.Ct. at 1168. However, isolated phrases such as "public domain" are not dispositive. *Solem,* 475 U.S. at 463 n. 17, 104 S.Ct. at 1168 n. 17. This is especially so where, as in this case, the purpose of the surplus land act is simply to open reserved lands to non-Indian settlement. *Solem,* 463 U.S. at 475, 104 S.Ct. at 1168. The words "restored to the public domain and opened to settlement" can mean "available for settlement with no

change in reservation boundaries" as easily as "available for settlement because no longer reservation." *See Ute Indian Tribe v. Utah,* 773 F.2d 1087, 1092 (10th Cir. 1985). Withdrawal and allotment followed by open settlement is consistent with reservation status. *Mattz v. Arnett,* 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973).

Further, the "public domain" and "open for settlement" language of the Act contrasts sharply with the plain language of cession noted by the Supreme Court in *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) and *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). *DeCoteau* involved an act stating that the Lake Traverse Indian Tribe had agreed to "cede, sell, relinquish, and convey" all its claims to unallotted lands on the Lake Traverse Indian Reservation. Similarly, in *Rosebud,* the surplus land acts incorporated the tribe's agreement to cede a portion of their land to the United States for a sum certain. *See Solem,* 465 U.S. at 469–70 n. 10, 104 S.Ct. at 1165–66 n. 10. In this case, neither the 1908 Act nor the legislative history shows either language of cession or a governmental undertaking to compensate the Navajo Tribe for ceded lands.

Finally, Presidents Roosevelt and Taft knew how to use plain language of cession in executive orders. On May 15, 1905, President Roosevelt used the following words to disestablish a portion of the Navajo Reservation not involved in this litigation:

> The Executive Order of March 10, 1905, setting apart certain lands in Utah as an addition to the Navajo Indian Reservation, is hereby cancelled....

President Taft entered the following executive order on November 26, 1912:

> Executive Order No. 1632, dated October 28, 1912, making an addition to the Moapa River Indian reservation, in Nevada, is hereby cancelled....

In both cases, the President-writer stated, "the Executive Order ... is cancelled." No such plain reference to cession appears

in either of the executive orders disputed here.

## 2. Events Surrounding Passage.

The language of the 1908 Act does not provide substantial and compelling evidence of intent to diminish the boundaries of the Navajo Reservation. However, intent to diminish may still be inferred when:

> Events surrounding the passage of a surplus land Act—particularly the manner in which the transaction was negotiated with the Tribes involved and the tenor of legislative Reports presented to Congress—unequivocally reveal a widely-held, contemporaneous understanding that the affected Reservation would shrink as a result of proposed legislation. . . .

*Solem,* 471 U.S. at 463, 104 S.Ct. at 1161. Neither side in this case adduced any evidence of negotiation between the Navajo Tribe and the United States concerning cession of the unallotted portions of 709/744. P & M makes no argument on the basis of any such negotiations. P & M does argue, however, an intent to diminish based on legislative history and executive correspondence.

P & M argues that the unequivocal contemporary understanding was that the 709/744 area was intended to be "a Reservation only for a limited time and purpose—allotment to individual Indians—and that Reservation status would terminate when that purpose was fulfilled." P & M's Post Hearing Memo, at 7. Letters from the Indian Office to Congress, members of the public, and New Mexico officials refer to the reservation plan as "temporary." Further, the House Report refers to the "temporary reservation" of the 709/744 area. *See* H.Rep. No. 1663, 60th Cong., 1st Sess. (1908).

The first difficulty with this argument is that all reservations were considered temporary in 1908. *Solem* at 468, 104 S.Ct. at 1165. The Congresses that passed the surplus land acts assumed that the entire Indian reservation system would disappear within a generation. *Id.; see also, Ute Indian Tribe,* 773 F.2d at 1097 nn. 6–7 (Seymour, J., concurring). The second difficulty with the argument is that the letters involve concerns over land ownership and use. In short, they concern title and not jurisdictional boundaries. P & M's expert urged eloquently that the distinction meant nothing to the relevant actors at the turn of the century. Nevertheless, it is settled law that, for purposes of this analysis, title and boundaries are not coextensive. *Solem,* 465 U.S. at 468, 104 S.Ct. at 1164. Again, withdrawal and allotment followed by reopening for non-Indian use is consistent with continued Reservation status. *Mattz, supra.*

I conclude that the Act contains neither language of cession nor a commitment to compensate the Navajos for ceded lands. I conclude further that the events surrounding the passage of the Act do not unequivocally reveal a widely-held, contemporary understanding that the Reservation would shrink.

## 3. Events Following Passage.

*Solem* held that "to a lesser extent" we may have recourse to events occurring after the passage of surplus land acts to divine congressional intent:

> Congress' own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unallotted open lands.

*Solem,* 465 U.S. at 471, 104 S.Ct. at 1166. P & M offers its strongest evidence of disestablishment in this connection.

P & M documented that on five occasions between 1911 and 1917 the Interior Department needed certain lands in the 709/744 area to be Reservation in order to take action toward them. In each case, the executive purported to re-withdraw the lands and make them Reservation. Again, from 1916 through the 1930's, Indian Office employees and others repeatedly urged Congress to extend the Navajo Reservation *into* the 709/744 area in order to solve the "problem" of the "public domain Navajos."

P & M's Reply Brief, at 8. Congress took no such action.

The Tribe's research, however, makes it clear that there never was a consistent congressional or Interior Department position on the jurisdictional status of the 709/744 area. Congresses between 1919 and 1927 appropriated funds for the "Pueblo Bonito" Reservation. "Pueblo Bonito" referred to the 709/744 area. Further, after 1927, when the name of the agency was changed from "Pueblo Bonito" to "Eastern Navajo," congressional reports began referring to the "Eastern Navajo Indian Reservation." As for subsequent treatment by Interior, there has been a Bureau of Indian Affairs (BIA) office in the 709/744 area continuously since 1907. The office provides the full panoply of services to Navajos in the area. Finally, between 1909 and 1927, maps and reports of the Commissioner of Indian Affairs and the Interior Department depicted the 709/744 area as an Indian Reservation.

Subsequent treatment of the 709/744 area by Congress and the Department of the Interior is therefore inconclusive. In any event, this history does not approach the standard of "substantial and compelling" evidence required for a finding of diminishment.

### 4. Indian Character of the Area.

Solem prescribes one last inquiry:

[W]e have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation. Where non-Indian settlers flooded into the opened portion on a Reservation, and the area has long since lost its Indian character, we have acknowledged that a defacto, if not dejure diminishment may have occurred.

Solem, supra at 471, 104 S.Ct. at 1166.

The Court in Solem conducted this inquiry with respect to the Cheyenne River Sioux Reservation and concluded that the opening of that reservation "was a failure." Solem, 465 U.S. at 480, 104 S.Ct. at 1171. This was because so few settlers in fact "poured in" to the opened area. As a result of this and of the large numbers of tribespeople who continued to live in the area, the population at the time of the decision in Solem was about evenly divided between Indians and non-Indians. Considering these demographics and the fact that both the BIA and the Tribal government continued to have a strong presence in the area, the Court concluded that it was "impossible to say that the opened areas of the Cheyenne River Sioux Reservation have lost their Indian character." Id. at 480, 104 S.Ct. at 1171.

If the opening of the Cheyenne River Sioux Reservation was a failure, the opening of the 709/744 area of the Navajo Reservation was a monumental failure. Within a year of Executive Order 1000, only two whites had entered 709/744 for settlement. In 1939, the area had 280 white residents and 9,000 Indians. Today the 709/744 area remains 87% Navajo. Furthermore, despite the presence of a large portion of the P & M mine in the area and of a large Anglo ranching concern, 75% of the land in 709/744 is either owned by Indians or administered for their use.

Both the BIA and the tribal government have maintained a strong presence in the 709/744 area. As noted above, the BIA has had an agency in the area continuously since 1907. The BIA for the Eastern Navajo Agency has a current annual budget of $8,000,000. Three-fourths of the budget is expended on projects within the 709/744 area. The BIA spends another $24,000,000 annually for school programs in the Eastern Navajo Agency.

The Tribe treats Navajos in the 709/744 area no differently than Navajos residing on tribal trust lands. This involves providing services through a host of tribal programs, including community development, child development, social services, health, education, youth development, and water resources. Some of the money comes from the Navajo general fund. A large portion of the funds comes from the federal government, being administered by the Tribe. The contribution of the State of New Mexico is small. For example, the

Navajo Division of Social Welfare spends in excess of $41,000,000 annually. New Mexico's contribution is but $390,000.

The prominent law enforcement agency in the 709/744 area is the Navajo Nation Police. The vast majority of civil and criminal disputes are litigated in Navajo Tribal Court. The Tribe proved up many more indications, too numerous to detail here, of the dominance of the Navajo Nation over life in the 709/744 area.

I conclude that the 709/744 area has never lost its Navajo character.

Nothing in the 1908 Act, its legislative history, subsequent congressional and executive conduct, nor in the subsequent history of the 709/744 area itself provides substantial or compelling evidence of a congressional purpose to shrink the boundaries of the Navajo Reservation. Therefore, the old reservation boundaries survived the opening of the 709/744 area. The 709/744 area lies within the exterior boundaries of the Navajo Reservation.

Because I have decided that the 709/744 area lies within the Navajo Reservation, I need not address the Tribe's claim that the area is a "dependent Indian community" within the meaning of 18 U.S.C. § 1151(b).

### *Conclusion*

Because the South McKinley Mine is on the Navajo Reservation, the Indian Abstention Doctrine of *National Farmers Union* and *Iowa Mutual* applies in this case. I hereby abstain. This case shall be dismissed without prejudice. Now, Therefore,

IT IS ORDERED that the complaint and its causes of action shall be, and hereby are, dismissed without prejudice.

/s/ Edwin L. Mechem
SENIOR UNITED STATES DISTRICT JUDGE